OPINION OF THE COURT
Jasen, J.
We are called upon in this case to balance the weighty considerations of society’s right to expose criminal improprieties within the New York City Department of Correction and a priest’s solemn obligation to assist those who beckon for his guidance and help in the utmost confidence.
These are the pertinent facts. At the direction of the Extraordinary Special and Trial Term Grand Jury of New York County, appellant Reverend Louis Gigante, an ordained priest of the Roman Catholic faith and, at the time, a New York City Councilman, was subpoenaed to appear and testify before the Grand Jury, impaneled to investigate abuses and improprie *164 ties within the New York City Department of Correction, with respect to preferential treatment accorded certain members of organized crime incarcerated in New York City correctional facilities. On August 29, 1977, appellant, after receiving immunity (CPL 190.40), was questioned concerning both his relationship with various employees of the Department of Correction and his efforts to secure for one James Napoli, a prisoner incarcerated from October, 1974 to March, 1975 in institutions under the jurisdiction of the New York City Department of Correction, a Christmas furlough and entrance into a work-release program. Although appellant responded to these questions, when asked if he had any conversations with Napoli concerning the conditions of Napoli’s incarceration, appellant refused to answer asserting the priest-penitent privilege. On August 30, 1977, the Presiding Justice ruled that "the privilege was appropriately invoked” with respect to these conversations.
On September 7, appellant reappeared before the Grand Jury and was asked about a conversation he had with an officer of the New York City Department of Correction which was allegedly prompted by an earlier discussion with Napoli. Appellant did not respond, stating: "I really refuse to answer basically, not only as a priest, but that the questions attempt to infringe upon my practicing my ministry, which is protected by the First Amendment of the Constitution.”
Again, on September 9, appellant refused to answer several inquiries upon the ground that the priest-penitent privilege and his First Amendment right to practice his ministry precluded him from replying. A sampling of the questions are as follows:
"Q Do you recall speaking to Mr. Ford [a Correction Department official] about James Napoli, Sr. and concerning the possibility of Mr. Napoli being put in a work-release program?
4*
"Q Do you recall saying in substance to Mr. Ford, 'And if I prove that people have gotten out who are heavy gamblers, who are organized crime what happens then, make a big stink about it? I know a lot of things that have happened that I will not divulge at this time, a lot of things that is bad for the Correction Department. I don’t want to hurt you. I would only use that as a means of helping James Napoli.’
"Do you recall telling that to Mr. Ford?
*165 * * *
"Q During the period of time from October 30, 1974 to March 27, 1975, did you talk to Jesse Harris [a Correction Department official] concerning getting Mr. Napoli in a work-release program?
* * *
"Q During the period of October 30, 1974 to March 27, 1975, did Jesse Harris refer you to Deputy Commissioner Birnbaum concerning the possibility of getting James Napoli into a work-release program?
* * *
"Q Father, did you on behalf of your brother, Ralph Gigante, contact Jesse Harris in an effort to get your brother transferred from Rikers Island to a less strict institution in the Department of Correction?”
The parties sought the assistance of the court to determine whether appellant was justified in refusing to answer. On September 29, the Judge, although observing that nothing in the minutes before the Grand Jury intimated that appellant engaged in any criminal activity, found that the "Grand Jury might reasonably] wish to inquire into the apparent use in part of [appellant’s] position as a public official on behalf of a prisoner * * * and there is at least a possibility in the absence of any answers from the Father that he might have information of some criminality attending Napoli’s treatment.” The court denied appellant’s claim of a First Amendment privilege "except as to his conversations with Mr. Napoli”, and directed appellant to answer questions "relating to either his efforts to secure a furlough or work release program for Mr. Napoli or as to any knowledge that he may have of preferential treatment that Mr. Napoli received in terms of visitors, food, assignments [and], work assignments”.
Thereafter, on both November 2 and 16, 1977, appellant again testified before the Grand Jury. On November 16, appellant refused to reply to many of the inquiries which the court had previously determined to be proper. Appellant reiterated his position that he would not respond because to do so would jeopardize the free exercise of his ministry. Further, appellant asserted that the prosecutor had already obtained the requested responses insofar as appellant had fully answered such inquiries at prior proceedings and the prosecutor had in his possession a transcript of the conversa *166 tions between appellant and. Mr. Ford, a Correction Department official, which had been recorded by the latter.
On December 16 and 21, 1977, appellant, pursuant to an order to show cause, appeared before the court to explain why he should not be adjudged in criminal contempt (Judiciary Law, § 750) for his refusal to respond to those questions which the court had directed him to answer. Appellant, remaining steadfast in his prior position that he would not respond, was held in contempt and committed to prison for 10 days. On appeal, the Appellate Division affirmed the judgment of contempt.[1] There should be an affirmance.
On this appeal, appellant justifies his recalcitrance before the Grand Jury on two grounds: First, the existence of a priest-penitent privilege which forbids disclosure of the requested information; and, second, the right to practice his ministry unhampered by the "chilling effect” which compelled disclosure might breed. We now conclude that neither asserted justification can serve to shield appellant from his obligation to respond to the Grand Jury’s inquiries.
It has been recognized, without serious disagreement, that there existed no common-law priest-penitent privilege. (See, generally, 8 Wigmore, Evidence [McNaughton rev, 1961], § 2394; Richardson, Evidence [10th ed], § 424.) By statute, however, "a confession or confidence made to [a clergyman] in his professional character as spiritual advisor” shall not be disclosed "[u]nless the person confessing or confiding waives the privilege”. (CPLR 4505.) It is clear that the Legislature by enacting CPLR 4505 and its predecessors responded to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one’s self and others can be realized.
The priest-penitent privilege arises not because statements are made to a clergyman. Rather, something more is needed. There must be "reason to believe that the information sought required the disclosure of information under the cloak of the confessional or was in any way confidential” for it is only confidential communications made to a clergyman in his spiritual capacity which the law endeavors to protect. (Matter *167 of Puglisi v Pignato, 26 AD2d 817; CPLR 4505; see People v Gates, 13 Wend 311, 323-324; Kruglikov v Kruglikov, 29 Misc 2d 17, app dsmd 16 AD2d 735; United States v Wells, 446 F2d 2, 4; see, generally, Matters to Which the Privilege Covering Communications to Clergyman or Spiritual Adviser Extends, Ann., 71 ALR3d 794, 808-809.)
Although we recognize that statutes bestowing an evidentiary privilege should be construed in furtherance of their "policy to encourage uninhibited communication between persons standing in a relation of confidence and trust” (People v Shapiro, 308 NY 453, 458), it is all too apparent here that the questions which appellant was directed to answer did not jeopardize the atmosphere of confidence and trust which allegedly enveloped the relationship between appellant and Napoli. Rather, the inquiries were directed to elicit from appellant efforts taken by him, independent of any communications between appellant and Napoli, to secure for the latter entrance into a work-release program. Compelling disclosure as to these matters would not do violence to the social policies underlying the priest-penitent privilege insofar as appellant contacted officials of the Department of Correction, strangers to the confidential relationship, in his attempt to assist Napoli. It is only these contacts with the Department of Correction officials that the court ordered disclosed, and the revelation of such conversations, spoken outside the sphere of confidentiality, cannot be said to fall within the sanctuary of the priest-penitent privilege.
Appellant’s broader contention that he would not respond to the questions posed by the Grand Jury because disclosure would unduly impinge upon the right to practice his ministry as guaranteed by both the State and Federal Constitutions is equally without merit. In our view, the constitutional rights claimed by appellant cannot serve to justify his refusal to answer.
There can be little doubt that the Grand Jury serves a compelling State interest to ensure that peace and order is maintained in our society.[2] It functions to protect the community from disruption by those who elevate and obtain their purely personal desires in ways not sanctioned by society-at- *168 large, while, at the same time, protecting persons from unfounded accusations. (See People v Woodruff, 26 AD2d 236, 238-239, affd 21 NY2d 848; Branzburg v Hayes, 408 US 665, 686-688; Smilow v United States, 465 F2d 802, 804-805, vacated on other grounds 409 US 944.)
In furtherance of its essential function, the Grand Jury, as an arm of society, is entitled to the assistance of all members of the community in uncovering criminal acts. The enduring command that " '[e]very man owes a duty to society to give evidence when called upon to do so’ ” must be honored if the fundamental task of the Grand Jury is to be realized. (People v Woodruff, 26 AD2d 236, 238-239, supra, citing Matter of Manning v Valente, 272 App Div 358, 364, affd 297 NY 681; see Branzburg v Hayes, 408 US 665, 688, supra; cf. Matter of Jacqueline F., 47 NY2d 215.)
On the record before us, appellant raises no colorable First Amendment right. His right to practice his ministry cannot serve to shield him from shedding light upon whether or not any unlawful efforts were undertaken to assist those confined in New York City penal institutions to obtain special privileges and entrance into work-release programs or to obtain a transfer to less secure institutions. In so holding, we observe that the statutory privilege (CPLR 4505) affords appellant any necessary protection against infringement of freedom of religion by Grand Jury investigations, and we reject his contention that the right to practice his ministry bestows more extensive protection beyond the scope of the priest-penitent privilege accorded by statute. (Cf. Branzburg v Hayes, 408 US 665, supra.) Absent a showing that the conversations sought to be disclosed are embraced by the priest-penitent privilege, appellant, even though a clergyman, is, like all citizens, obligated to respond to those questions relevant to the Grand Jury’s investigation.
Nor do we accept appellant’s contention that insofar as the Special Prosecutor already received the necessary responses to his questions or possessed an alternate source from which they could be obtained, further compelled answers would serve only to infringe upon, without reason or justification, appellant’s asserted constitutional rights. Faced with a similar challenge involving a claim by reporters that the State must first demonstrate "that a crime has been committed and that [the reporters] possess relevant information not available from other sources” before they can be required to testify before the *169 Grand Jury, the Supreme Court in Branzburg v Hayes (408 US 665, 701, supra) observed: "The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. To this end it must call witnesses, in the manner best suited to perform its task. 'When the grand jury is performing its investigatory function into a general problem area * * * society’s interest is best served by a thorough and extensive investigation.’ Wood v. Georgia, 370 U. S. 375, 392 (1962). A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.’ United States v. Stone, 429 F. 2d 138, 140 (CA2 1970).” Simply stated, it is for the Grand Jury to determine the most efficacious procedure to carry out its investigation, and even assuming the Grand Jury could have obtained the answers to its stated questions from an alternate source, it was entitled to hear such answers from appellant and probe further into the facts so revealed if it deemed more extensive inquiry necessary to carry out its function.
In sum, we now hold that in the context of this case appellant was not justified, either by virtue of the claimed priest-penitent privilege or by reason of his claimed right to practice freely his ministry, in refusing to respond to the questions which the court directed him to answer. As to appellant’s remaining contentions, we find them to be without merit.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Chief Judge Cooke and Judges Jones, Wachtler and Fuchsberg concur with Judge Jasen; Judge Gabrielli taking no part.
Order affirmed.

. By order dated September 7, 1978, the Appellate Division stayed the execution and enforcement of the judgment of Supreme Court pending the determination of this appeal.

. As our State Constitution commands: "The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law.” (NY Const, art I, § 6.)