Smith, J.
(concurring). The issues here are whether the testimony of two ministers was received at trial in violation of defendant’s statutory priest-penitent privilege[1] despite the fact that defendant denies making any confession to them, whether he waived that privilege, if it is applicable in this case, and whether defendant’s account of his statements to the two ministers is precluded in any event as a violation of his constitutional right to counsel. We agree that the order of the Appellate Division upholding the murder conviction should be affirmed but do so for reasons different from our colleagues.
No priest-penitent privilege was ever invoked or established in this case. Thus, no reason exists to find error and decide this case on harmless error grounds. Neither defendant nor the two ministers to whom he allegedly confessed testified at the in limine hearing following which the court decided to admit the testimony of the two ministers. When defendant *616 took the stand at his trial, he denied ever telling the two ministers that he had killed a woman in New York. Thus, in order to recognize a priest-penitent privilege here, the majority must conclude that defendant was lying when he denied confessing the killing to the two ministers. Despite his testimony, the Court invokes defendant’s personal priest-penitent privilege for him.
Moreover, we disagree with the majority in another, equally fundamental, respect. Even assuming for the sake of argument that the priest-penitent privilege had been properly invoked, the privilege was nullified, as held by Supreme Court and the Appellate Division, by the voluntary conduct of defendant. He acted contrary to the very essence of the privilege by discussing the subject matter of the purportedly confidential communication with third persons (see, 8 Wigmore, Evidence § 2285 [McNaughton rev 1961]; Richardson, Evidence §§ 418, 425 [Prince 10th ed]; and see, e.g., People v Figueroa, 173 AD2d 156, 159; Matter of Rivera v Coughlin, 133 AD2d 694, 695; People v O’Connor, 85 AD2d 92, 97; People v Fentress, 103 Mise 2d 179, 191-196). Defendant’s actions in publishing the purportedly confidential communication to third persons, including a bus station clerk and Florida police officers, can effect a "waiver of a statutory right” that does not require the presence of counsel under People v Samuels (49 NY2d 218) and People v Settles (46 NY2d 154). To suggest otherwise manifests a misconception of the conceptually different and distinct bases for the priest-penitent privilege and the constitutional right to counsel for waiver of constitutional rights purposes under People v Samuels and People v Settles.
I
Defendant’s conviction for murder in the second degree arose from the death by strangulation of his girlfriend in March 1985, in Yonkers, Westchester County. After the killing, defendant left New York City and went to Florida. In the bus station in Miami, he encountered a Greyhound ticket clerk by the name of William Jaramillo. He related to the clerk that he was involved with drugs and with killing someone. At that point, Jaramillo called his pastor, Reverend Jose Hernandez. He and another pastor, Hector Mimoso, a former police detective, arrived at the bus station. Defendant eventually confessed to the ministers that he had murdered two women in Yonkers. The ministers convinced defendant to turn *617 himself in to the police. Defendant did so and, following Miranda warnings, gave oral and written statements to the Florida police admitting to a murder in Yonkers. Defendant also related to the police the substance of what he told the ministers.
Prior to the jury trial, defendant moved, inter alia, to suppress physical evidence and identification evidence. During the course of the hearing, defendant’s statements to the Florida police and the priest-penitent issue were considered. Several police officers, including Miami-Dade Police Officer Detective Julio Torres, testified. Defendant presented no evidence. Following the hearing, the court, with no opposition from the People, suppressed defendant’s statements to Detective Torres on the People’s direct case. The court ruled that the statements could be admitted for impeachment purposes. Those rulings are not in issue before us.
The hearing court ruled further that statements made by defendant to Reverend Hernandez and Reverend Mimoso were privileged. The court concluded, however, that defendant’s gratuitous and voluntary confession of the full content of the privileged communications to Detective Torres constituted a waiver of the privilege by defendant. The testimony of the two ministers was admitted into evidence on the People’s direct case. Defendant’s statements to the Florida police, which included his statements to the ministers, were admitted into evidence on defendant’s direct case.
At the trial, the testimony of several witnesses established defendant’s connection to the murder. Dorothy Stephens and David Hawkins stated that they saw the victim, Olga Estremera, enter defendant’s apartment and heard the sounds of screaming and the sounds of Estremera being thrown about the apartment. Alfredo Martinez testified that around the time of the killing he saw what he thought was blood on defendant’s face. Marvin Barnett stated that at approximately the same time as the killing, he saw blood on the hand and fingertips of defendant.
William Jaramillo, Reverend Jose Hernandez and Reverend Hector Mimoso testified concerning the priest-penitent privilege. William Jaramillo testified that when he saw defendant at the Greyhound bus station in Miami, he realized that defendant was "in a deep need” and asked defendant to come over to the ticket counter. Jaramillo stated that he spoke with defendant and repeatedly reassured him that God loved him. *618 Defendant told Jaramillo about his problems with drugs, and also "mentioned killing somebody.” At that point, Jaramillo felt that he was no longer able to help defendant and referred him to his pastor, Reverend Jose Hernandez.
Reverend Hernandez testified that defendant told him and Reverend Hector Mimoso that he killed his girlfriend, and they urged him to turn himself in to the police.
In his own defense, defendant testified to the following: He rented an apartment at 150-152 Elm Street, Yonkers, from the man who owned that building and a nearby grocery store. He was married and the victim had been "[his] mistress” for approximately eight months prior to her death. On the day of the killing, he invited William Ramirez, whom he met that day, to his apartment at 150-152 Elm Street. Sometime later, Ramirez arrived at his apartment and argued with the victim about the fact that his wallet, documents and money that he had left at the victim’s house were missing. Defendant left Ramirez and the victim in the apartment for approximately 40 minutes and went to a corner store to buy beer. When he returned to his apartment, Estremera had already been killed by Ramirez, who told him that he had killed the victim because she had stolen $2,000 from him. Ramirez threatened to kill defendant and his family if defendant did not take the blame for the killing.
Defendant testified further that he told his sisters in Brooklyn and New Jersey that he had been accused of a death in Yonkers. Next, he purchased false identification and a Greyhound bus ticket to Miami, and, for the next three days, rode a bus to Miami. On his arrival, defendant met a Greyhound ticket clerk named William Jaramillo, and two ministers, Reverend Hernandez and Reverend Mimoso.
According to defendant, he told Jaramillo that he had been charged with a killing in Yonkers, New York. Jaramillo gave him the number of Reverend Hernandez, and, when he met with Reverend Hernandez, defendant stated that he had been accused of a death in Yonkers. Defendant denied telling Jaramillo or either pastor that he had killed someone. Defendant stated further that after his arrest, he spoke to the police. Defendant testified that the police conducted a harsh interrogation and that he asked repeatedly not to be questioned because he was very weak. Defendant testified further that he gave a signed confession, which was offered by him and admitted into evidence, because he wanted to rest in jail *619 and because he did not want Ramirez to kill his family. Defendant denied killing the victim. He stated that the details of his confession were either supplied by Ramirez or made up.
It should be emphasized that, pursuant to the ruling of the hearing court, the People did not attempt to admit into evidence on their direct examination defendant’s statements to the police. Rather, defendant’s attorney elicited the evidence of those statements on examination of defendant. Only after defendant had testified on direct examination did the People question defendant about his statements to the police.
On rebuttal, Detective Torres testified as follows:[2] On March 22, 1987, at approximately 2:40 p.m., defendant was taken into custody from the home of Reverend Hernandez. At approximately 5:30 p.m. on that day, Detective Torres met defendant and administered Miranda warnings to him. Defendant signed a form waiving his right to have an attorney present. According to Detective Torres, at no time did defendant indicate that he was unwilling to give a statement. Detective Torres questioned defendant about what occurred and defendant gave answers, from which Detective Torres made notes. Thereafter defendant gave an oral statement confessing to Estremera’s murder.
According to Detective Torres, defendant’s statement consisted of the following: Defendant knew the victim for several years but had been intimate with her only in the last seven months. The victim was a police informant and had threatened to tell the police that he was a drug dealer. On the night of the killing, after the victim gave him "black beauty” pills, he beat and strangled her. Defendant stated that he then told his two sisters what had happened. Defendant then took a Greyhound bus to Miami where he became acquainted with William Jaramillo. Defendant told Jaramillo about the homicide and Jaramillo introduced him to two ministers. Defendant told the ministers what had happened in New York and they told him that he should turn himself in. Defendant agreed and asked one of the ministers to telephone the police. *620 Thereafter, defendant gave a similar sworn, stenographically recorded statement. Detective Torres testified that defendant did not express an unwillingness to continue with the interview, and no one coerced defendant into giving the statements. Detective Torres testified further that when he took the statements, he was not aware that a New York warrant had been issued for defendant’s arrest.
The jury found defendant guilty of murder in the second degree. The Appellate Division affirmed, agreeing that defendant had waived his priest-penitent privilege by voluntarily repeating to Detective Torres the substance of his admissions to the ministers (186 AD2d 214). A Judge of this Court granted leave to appeal.
II
On this appeal, defendant argues that the statements to the two ministers should not have been admitted at trial because (1) he never waived the clergy-penitent privilege, and (2) his statements to Detective Torres were taken in violation of his right to counsel.
Turning first to the right to counsel argument, a "defendant’s right to counsel attache[s] when [a] felony complaint [is] filed and [an] arrest warrant issued” (People v Samuels, 49 NY2d, at 221, supra). Where formal judicial proceedings have begun, "there may be no waiver of the right to counsel unless an attorney is present” (People v Settles, 46 NY2d, at 166, supra; People v Samuels, supra). Thus, statements obtained from a defendant in the absence of counsel after the filing of a felony complaint and the issuance of an arrest warrant should be suppressed (see, People v Samuels, supra).
Here, a warrant for defendant’s arrest was issued prior to his interrogation by the police. The People concede that the Metro-Dade Police Department violated defendant’s right to counsel by interrogating him after a New York arrest warrant had been issued for him. They urge, however, that since defendant impliedly waived his statutory priest-penitent privilege by voluntarily recounting the otherwise privileged communication to the police, his statements to the clergy should not be suppressed. The People contend further that defendant offered no evidence at the hearing on the priest-penitent privilege and thus failed to establish his burden that the communications were intended to be confidential.
The availability of the priest-penitent privilege "depends not *621 on the contents of the privileged communication but rather on the character of the communication, the relationship between the parties to it and the circumstances under which it was made.” (Majority opn, at 610-611, n 2.) The Samuels/Settles right to counsel, in contrast, recognizes that the assistance of counsel is essential once a criminal prosecution has been commenced because then the "defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law” (Kirby v Illinois, 406 US 682, 689). The voluntary act of defendant in doing something adverse to the confidential "character of the communication” — i.e., divulging it to third persons either publicly or privately — has no relationship to the rationale for the Samuels/Settles constitutional right, the need for protection from the "prosecutorial forces of organized society” (Kirby, 406 US, at 689, supra). This distinction was perceived by the Court in People v O’Connor (85 AD2d 92, supra). There, in rejecting the defendant’s claim that he could not waive the attorney-client privilege in the absence of counsel, the Court stated that the argument "confuses waiver of the constitutional right to counsel in a criminal proceeding with the waiver of the statutory attorney-client privilege” (id., at 97).
Nor does it matter that defendant’s actions in making public the confidential communication were statements to the police instead of, for example, to a newspaper reporter. To the police statements, themselves, the Samuels/Settles right, of course, does attach, and the police are precluded from testifying to their content. But what is involved here is not the content of the statements to the police but solely the fact that defendant took steps which broke the seal of confidentiality, thereby wiping out the basis for the privilege and making it possible for the priests to testify to what defendant said to them in alleged confidence (see, People v Figueroa, 173 AD2d, at 159, supra; People v Fentress, 103 Mise 2d, at 191-196, supra). The expansion of the Samuels/Settles rationale into these circumstances is not justified by logic and precedent. Moreover, it contradicts the approach concerning indirect invocation of our counsel rules (see, People v Bing, 76 NY2d 331). While the majority does not expressly state that it is expanding the right to counsel rule in Samuels to situations involving a priest-penitent privilege, in effect, that is what it is doing because the testimony of the clergy members is being suppressed (see, majority opn, at 612).
*622 Ill
While it would be unnecessary to deal with the waiver issue if we were to conclude, as three of us do, that the privilege was not invoked, it will be addressed in view of the development of the issue among the members of the Court. Waiver of the priest-penitent privilege may be express, "upon the trial or examination by the person confessing” (Matter of City Council v Goldwater, 284 NY 296, 300; see also, Richardson, Evidence § 425, at 419 [Prince 10th ed] [commenting on former Civ Prac Act §§ 351, 354]) or by implication, upon the "voluntary public or private disclosure before trial of the privileged communication” (Richardson, Evidence § 418, at 413 [Prince 10th ed]).
The parties do not dispute that there was no express waiver of the priest-penitent privilege in this case. Defendant asserts that there was no waiver by implication because he could not waive the priest-penitent privilege in the absence of counsel. Defendant misconstrues waiver of the constitutional right to counsel in a criminal proceeding with the waiver of the statutory priest-penitent privilege. While this Court has stated repeatedly that a defendant cannot waive his constitutional right to counsel once it attaches, in the absence of counsel (see, People v Skinner, 52 NY2d 24; People v Marrero, 51 NY2d 56), we have made no such declaration regarding the waiver of the statutory priest-penitent privilege. That privilege is not constitutionally guaranteed, but rather, was created to encourage and protect confidential communications to members of the clergy in their spiritual capacity (see, Matter of Keenan v Gigante, 47 NY2d 160, 166; People v Shapiro, 308 NY 453, 458). A defendant who voluntarily discloses privileged communications not only to the police but to others before trial waives the privilege of confidentiality (see, Richardson, Evidence § 418, at 413 [Prince 10th ed]; cf, People v O’Connor, 85 AD2d 92, 97, supra [defendants may waive their statutory attorney-client privilege without their attorney being pres'ent]). Here, defendant’s voluntary disclosure to the civilian Jaramillo and the police of communications with the two ministers, coupled with his responses to one of the ministers as that minister telephoned the police that the murder had been committed in Yonkers, constituted an implied waiver of the statutory priest-penitent privilege, if such a privilege ever existed.
*623 IV
No priest-penitent privilege existed at common law (see, Matter of Keenan v Gigante, 47 NY2d 160, 166, supra; see generally, 8 Wigmore, Evidence § 2394 [McNaughton rev 1961]). The privilege attaching to communications to clergy is, however, codified in CPLR 4505 and provides, "Unless the person confessing or confiding waives the privilege, a clergyman, or other minister of any religion or duly accredited Christian Science practitioner, shall not be allowed to disclose a confession or confidence made to him in his professional character as spiritual advisor.” "[T]he Legislature by enacting CPLR 4505 and its predecessors responded to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one’s self and others can be realized” (Matter of Keenan v Gigante, 47 NY2d, at 166, supra). To be sure, the statute does not render a communication privileged merely because it has been made to a clergyman (see, id.). Rather, for the privilege to attach, there must exist a " 'reason to believe that the information sought required the disclosure of information under the cloak of the confessional or was in any way confidential’ ” (id., at 166).
"[Statutes bestowing an evidentiary privilege should be construed in furtherance of their 'policy to encourage uninhibited communication between persons standing in a relation of confidence and trust’ ” (id., at 167). The privilege belongs to the penitent, and it is the penitent who must establish the statutory confidentiality of the communication (see, People v Schultz, 161 AD2d 970, 971; see also, People v Osorio, 75 NY2d 80, 85; People v Mitchell, 58 NY2d 368, 373). The propriety of the privilege may be tested by the four canons already established for privileged communications (8 Wigmore, Evidence § 2396, at 878 [McNaughton rev 1961]).[3] First, the communication must originate in a confidence of secrecy and the penitent must evince an intent to have the communication remain confidential (see, People v Johnson, 115 AD2d 973; see also, 8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). Second, the confidentiality of the communication must be essential to *624 the relation "for it is only confidential communications made to a clergyman in his spiritual capacity which the law endeavors to protect” (Matter of Keenan v Gigante, 47 NY2d, at 166, supra; 8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). Thus, for the privilege to apply, the communication must be made to a member of the clergy for the purpose of "seeking religious counsel, advice, solace, absolution or ministration” (Matter of Fuhrer, 100 Misc 2d 315, 320, affd sub nom. Matter of Fuhrer v Hynes, 72 AD2d 813). Third, the penitential relation must deserve recognition and countenance (8 Wig-more, Evidence § 2396 [McNaughton rev 1961]). While it is not essential that the penitent be a member of the same place of worship from which he or she seeks spiritual guidance (see, Matter of Fuhrer, supra; see also, Richardson, Evidence § 425, at 418 [Prince 10th ed]), the communication in question must be penitential in character or must be made to the clergyman "under the cloak of the confessional” (Matter of Keenan v Gigante, supra, at 166). Stated differently, the terms "confession” and "confidence” contemplated by the statute refer to penitential admission to a clergyman of a perceived transgression while seeking religious or spiritual guidance, and apply to voluntary confessions or confidences as well as those made pursuant to a religious decree. Fourth, the injury to the penitential relationship from compulsory disclosure must be greater than the benefit to justice (8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). For example, the statutory priest-penitent privilege cannot be used as a shield to cover up criminal activities in which a clergyman is allegedly involved (Matter of Fuhrer, supra).
None of these four canons by which privileged communications may be tested was established. Defendant did not testify at the hearing or present any evidence. The majority’s conclusion that the privilege was established can rest solely on the basis of Detective Torres’ hearing testimony. Detective Torres testified only that defendant made a decision to turn himself in; that it was defendant’s decision and not that of the ministers. The only other evidence at the hearing dealing with the clergy-penitent privilege issue was two affidavits by the ministers, Reverend Hernandez and Reverend Mimoso, introduced solely for comparison with Detective Torres’ testimony and defendant’s statements made to Detective Torres.
Defendant’s statements do not show that he intended to exercise the priest-penitent privilege, nor do they show that he intended that the statements remain confidential. In his *625 oral statement to Detective Torres, defendant said nothing to establish a priest-penitent privilege. In that oral statement, defendant admitted that he told Jaramillo that he had killed a woman. Defendant also stated orally that he admitted to the ministers that he had killed the woman.
The evidence at the hearing did not show that defendant communicated with the clergyman for the purpose of spiritual guidance. Reverend Hernandez’s affidavit indicated that when they initially met at the bus station, defendant sought spiritual advice as a result of his problem. At that time, however, defendant did not confide in him. Although defendant eventually spoke with Hernandez the next day, he gave him false information regarding the crimes (that he had killed two women) and never revealed to Hernandez the purpose for his communication. Thus, this evidence, on any interpretation, fails to meet defendant’s burden to prove the privilege.
Similarly, Reverend Mimoso’s statement fails to specify the purpose of defendant’s communication to him. Actually, Mimoso stated that Reverend Hernandez contacted him because Hernandez knew Mimoso was a former police officer.
Ultimately, neither of the clergyman’s affidavits, both containing hearsay statements, supports a finding of an attempt by defendant to protect his communications with them. While the majority asserts that the statements of the ministers were not admitted solely for the purpose of comparing them with the testimony of Detective Torres (see, majority opn, at 610, n 1), a fair reading of the record shows otherwise. Thus, neither the testimony of Detective Torres, nor the affidavits (assuming those affidavits had been admitted on the merits) establishes the personal invocation of the priest-penitent privilege or any of the four canons for testing the exercise of that privilege.
V
It should be emphasized that the majority finds a priest-penitent privilege even though defendant never took the stand at the hearing and notwithstanding the fact that at trial, defendant testified that he never told the ministers that he killed anyone. Defendant’s testimony at trial is thus wholly inconsistent with a priest-penitent privilege. No case cited by the majority and none decided by this Court grants the benefits of the priest-penitent privilege to a defendant who denies under oath that he made to the religious leader the confession sought to be suppressed.
*626 Contrary to the position of the majority, I cannot agree that defendant’s trial testimony has no relevance to the issue of the clergy-penitent privilege (see, majority opn, at 610-611, n 2). First, the issue of whether or not a discussion with members of the clergy should be suppressed arose from a request for a ruling from the court, in limine, that is, a preliminary ruling. The assumption was that defendant had made an incriminating statement to members of the clergy on a confidential basis and for spiritual purposes. In the face of defendant’s declaration that he never made such a statement, there is no basis to protect a nonexistent spiritual need and a nondeclared confidential communication.
Second, this case does not involve an issue on which the People have the burden of proving a clergy-penitent privilege. That burden was on the defendant. People v Dodt (61 NY2d 408), cited by the majority as precluding consideration of defendant’s trial testimony, does no such thing. There was no testimony by defendant in that case either at a pretrial identification hearing or at a trial. The Court held that the Appellate Division had erred in making a finding of independent source based solely upon evidence at trial. A new trial was ordered, preceded by a hearing on independent source. The case does not stand for the proposition that trial evidence cannot be considered on an issue such as the clergy-penitent privilege here, where a court has ruled based upon a set of facts (a presumption of defendant’s admission of guilt to a member of the clergy) which are inconsistent with defendant’s own position. While there is no evidence that counsel for defendant misled the court by seeking a ruling based on a priest-penitent privilege, defendant should not profit from a privilege which his own testimony indicates was never acquired.
Moreover, this case is unlike Simmons v United States (390 US 377, 394), where the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.” There, the Supreme Court was concerned with two constitutional rights, the right to be free from unreasonable searches and seizures and the right not to incriminate oneself. It held that one constitutional right could not be sacrificed (testifying at the hearing) by the assertion of another (the right not to testify at trial). Here, a purely *627 statutory privilege is involved and there is no surrender of one constitutional right by the assertion of another.
In sum, defendant did not lay a proper foundation to invoke the priest-penitent privilege and if he had, the evidence demonstrates that he impliedly waived that privilege. The trial court did not err in receiving the testimony of the two ministers.
Accordingly, while the order of the Appellate Division should be affirmed, it is not necessary to do so by reaching the issue of harmless error.
Chief Judge Kaye and Judges Simons and Levine concur with Judge Titone; Judge Smith concurs in result in a separate opinion in which Judges Hancock, Jr., and Bellacosa concur.
Order affirmed.

. The privilege is sometimes referred to as the clergy-penitent privilege.

. Detective Torres also testified on the People’s direct case that on March 22, 1987, at approximately 5:30 p.m., several officers from the MetroDade Police Department brought defendant into the department. Detective Torres was asked to serve as an interpreter to obtain certain background information from defendant. Detective Torres testified further that the police recovered from defendant a copy of a birth certificate issued in Puerto Rico, a Greyhound bus ticket, a Greyhound luggage ticket, a New Jersey driver’s license, and a check stub, all bearing the name of Jose Velazquez.

. While the applicability of the four canons in Wigmore to New York State is questioned (majority opn, at 609), it is hard to imagine which of the four is not applicable to the priest-penitent privilege as it exists in this State. The said canons are simply a summary and analysis of the clergy-penitent privilege as it exists in this State.