[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 316 
Father Paul G. Zoghby petitions this Court for a writ of mandamus directing the trial court to vacate its order granting Linda Ledet's motion to compel discovery of documents relating to psychological counseling Zoghby underwent. We deny the petition.
 Facts
Linda Ledet and her husband and children were parishioners at St. Mary's Catholic Church in Mobile from 1995 through 2001. During that time, Zoghby, who was an associate priest at St. Mary's at that time, developed a friendship with Ledet. According to Ledet, in late 1997 Zoghby began making improper and unwelcome advances toward her, including attempting to physically embrace her in an intimate or sexual manner, touching her on intimate parts of her body in a sexual manner, making lewd and sexually suggestive comments to her, exposing his genitalia to her, and attempting to force her, physically and by command as a priest, to engage in sexual relations with him.
During the summer of 2002, after attending a meeting described as an "open invitation to victims of abuse" sponsored by the Catholic Archdiocese of Mobile, Ledet filed a formal written complaint with the Archdiocese, asserting claims of sexual misconduct against Zoghby. This complaint was reviewed by Archbishop Oscar Lipscomb and Chancellor Michael Farmer.[1]
In his deposition testimony, Archbishop Lipscomb explained that when allegations of sexual misconduct are made, the Archbishop is responsible for directing the investigation into the alleged misconduct for the Archdiocese and for making a judgment and disposing of the complaint. He stated that because Ledet requested strict confidentiality in this matter, he investigated her claims himself.
Archbishop Lipscomb stated that when he began his investigation and confronted Zoghby about Ledet's allegations, Zoghby denied the alleged misconduct and in a written response to Ledet's complaint accused Ledet of improper conduct, mental instability, and untruthfulness. Archbishop Lipscomb indicated that when he considered Zoghby's oral denial and his written response, he questioned Zoghby's veracity, stating: "I just thought he wasn't telling the truth. It appeared that way from her description of things and from his responses. . . . I've had experience in people telling me the truth. And — it did not [appear to be] the whole truth." In September 2002, when Archbishop Lipscomb again confronted Zoghby about the allegations and his response, Zoghby recanted his *Page 317 
false allegations against Ledet and admitted his misconduct.
After Zoghby admitted his misconduct, the Archdiocese, acting through Archbishop Lipscomb, attempted to resolve Ledet's complaint. Archbishop Lipscomb explained that in resolving an issue of sexual misconduct by a priest in his Archdiocese he first addressed the needs of the victim; he then tried to
 "deal with the perpetrator to see is he salvageable and what are the conditions under which you might approach a return to some kind of active ministry. Because [the perpetrator] was going to be out of [the active ministry] for a good long period as a result of [the accusation]."
He stated that to resolve the complaint in this case the Archdiocese entered into an agreement with Ledet pursuant to which the Archdiocese agreed to pay for the therapeutic counseling and treatment necessary to enable her and her family to recover from the emotional and mental trauma of Zoghby's actions. The Archdiocese further promised Ledet that Zoghby would receive intensive therapy and counseling and that Zoghby would not be placed in a position where he could further harm others. As part of the agreement, Ledet and her family agreed to remain silent about Zoghby's actions, to not publicize the accusations against Zoghby, and to refrain from filing civil litigation against the parties involved.
In 2003 Ledet learned that Zoghby had returned to active ministry and that he had been "promoted" to the position of pastor over a parish in Foley. She also began "to question" whether Zoghby was actually receiving the therapy and counseling mandated by the agreement. According to Ledet, when she notified Archbishop Lipscomb that she believed the Archdiocese had not fulfilled its part of the agreement, Archbishop Lipscomb threatened her, "stating that publicity surrounding Zoghby's actions would be harmful to her and to her husband and children and that it would destroy [her] reputation."
The revelations that Zoghby had not received treatment and that he had been promoted to the position of pastor of a parish triggered "emotional trauma" in Ledet. She underwent treatment for this trauma at several facilities. When she presented the bills for her treatment to the Archdiocese for payment, the Archdiocese refused to pay.
In 2004, Ledet sued the Archdiocese, Archbishop Lipscomb, and Chancellor Farmer, alleging breach of contract and the tort of outrage. Ledet did not name Zoghby as a defendant.
As discovery progressed, Ledet learned that Zoghby had received some counseling under the supervision of Father Benedict Groeschel at Trinity Retreat, a Catholic counseling center in New York state that is connected with a psychiatric hospital, and that Zoghby had authorized the release of the records resulting from that counseling to Archbishop Lipscomb. Ledet requested that the Archdiocese produce all psychiatric records and reports relative to Zoghby's treatment, including "complete and correct" copies of all psychological and psychiatric testing. The defendants objected, alleging confidentiality and privilege.
Although not a party to the action, Zoghby also objected to Ledet's production request, claiming that the records of his treatment at Trinity Retreat were privileged under both the psychotherapist-patient privilege, see Rule 503, Ala. R. Evid., and the privilege accorded communications to clergy, see Rule 505, Ala. R. Evid. In support of his objection, Zoghby submitted an affidavit in which he explained the circumstances *Page 318 
of his counseling and the confidentiality he understood attached to his release to Archbishop Lipscomb of the documents relating to that counseling. Zoghby averred:
 "I have known Archbishop Oscar H. Lipscomb for many years and he is both my bishop and a spiritual advisor. I have entrusted to him many confidential matters over the years concerning my vocation and calling into the priesthood, and I have had many private discussions with him concerning my spiritual growth and discernment and I have always expected these matters of utmost trust would remain confidential. I am certain he feels the same way.
 "In the year 2002 and 2003, I participated in counseling with the Archbishop and signed a release authorizing my counselor to send to and give the Archbishop access to my counseling records in order to assist the Archbishop in giving me personal and spiritual guidance. I do not have these records in my personal possession. I simply released them to the Archbishop as a substitute for me getting the records and then forwarding them to the Archbishop. I am generally familiar with the clergyman's privilege since I am a priest myself. My communications with the Archbishop and my authorization for records to be released directly to the Archbishop constitute communications to the Archbishop in his professional capacity, as my bishop and a spiritual advisor. In my opinion, the communications are covered by the clergyman's privilege. They were made privately and it was not intended that the communications and the records related thereto be further discussed or given to any other person. The sole purpose of the communications with the Archbishop [was] to advise me as my bishop and a spiritual advisor."
Ledet moved to compel discovery of the records, claiming Zoghby had waived the psychotherapist-patient privilege by authorizing the release of the documents to Archbishop Lipscomb. Ledet further argued that the released documents were not protected by the clergyman privilege because, she maintained, the documents were not released to Archbishop Lipscomb in his professional capacity as Zoghby's spiritual advisor, but in his capacity as an administrator for the Archdiocese, investigator of her complaint alleging misconduct, and enforcer of the agreement she had entered into with the Archdiocese.
In support of her motion, Ledet submitted excerpts from Archbishop Lipscomb's deposition, in which Archbishop Lipscomb explained his relationship with Zoghby and his role in the investigation of her complaint against Zoghby. Archbishop Lipscomb stated that he was a close friend of Zoghby's, that he considered himself to have played a significant role in Zoghby's choosing and pursuing the priesthood, and that he was hurt when Zoghby lied to him during the investigation. Archbishop Lipscomb further explained that his discussions with Zoghby during and after the investigation did not address spiritual matters and that he did not consider himself to be Zoghby's spiritual advisor. Specifically, he stated that Zoghby did not engage in a spiritual confession to him and that he was not Zoghby's mentor. He admitted that "[he and Zoghby] obviously have discussed things that [he] thought were necessary for [Zoghby's] healing, and we obviously have discussed a program and the place where that would take . . . place. And since [Zoghby's] return, obviously, we have discussed his role in the parish and my expectations for it." Indeed, Archbishop Lipscomb explained his role in the process as follows: *Page 319 
 "[Counsel]: And you were able to get help for Father Zoghby.
 "[Archbishop Lipscomb]: That too.
 "[Counsel]: And you were able to get him help so that he can go back in the priesthood.
 "[Archbishop Lipscomb]: Obviously, it required [that I] see a change in his life."
Archbishop Lipscomb stated that while Zoghby was being treated in New York, he visited New York on other business and arranged to have a conversation with Zoghby to inquire about how "things" were going. He explained that after Zoghby returned to Alabama, he secured, through a release from Zoghby, the requested documents from Father Groeschel and the treatment facilities in New York. He stated that he relied heavily on the summary of the treatment and the recommendations of Father Groeschel and the doctor in charge of Zoghby's professional treatment in New York when he decided to promote Zoghby to pastor of his own parish.
The trial court granted Ledet's motion to compel and entered the following order:
 "(1) As to [Ledet's] motion to compel Defendants to produce psychological treatment records of non-party Zoghby, and the objections filed by Defendants and non-party Zoghby to the production of such records, the court has reviewed the documents] at issue in camera and grants [Ledet's] motion and overrules the objections, solely for the purposes of discovery. Defendants are ordered to produce the documents] at issue within 10 days of this order; however, the production is subject to the non-disclosure agreement previously entered into by counsel for [Ledet] and Defendants. . . .
 "(2) As to [Ledet's] motion for an order suspending the Agreement of Non-Disclosure, the motion is denied.
 "(3) As to Defendants' motion for protective order and to enforce non-disclosure agreement, the motion for protective order is denied, and the motion to enforce the non-disclosure agreement is granted. . . ."
 Standard of Review "Mandamus is an extraordinary remedy and will be granted only when there is `(1) a clear legal right in the petitioner to the order sought, (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so, (3) the lack of another adequate remedy, and (4) properly invoked jurisdiction of the court.' Ex parte Alfab, Inc., 586 So.2d 889, 891 (Ala. 1991). In Ex parte Ocwen Federal Bank, FSB, 872 So.2d 810 (Ala. 2003), this Court announced that it would no longer review discovery orders pursuant to extraordinary writs. However, we did identify four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus. Such circumstances arise (a) when a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-45 (Ala. 2001); (b) when a discovery order compels the production of patently irrelevant or duplicative documents the production of which clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit received by the requesting party, see, e.g., Ex parte Compass Bank, 686 So.2d 1135, 1138 (Ala. 1996); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a party's entire action or defense so that, in either event, the outcome of the case has been all but determined and the petitioner would be merely going through the motions of a trial to obtain an appeal; or *Page 320 
 (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that an appellate court cannot review the effect of the trial court's alleged error. The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case — that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'g Co., 601 So.2d 423, 426 (Ala. 1992)."
Ex parte Dillard Dep't Stores, Inc., 879 So.2d 1134,1136-37 (Ala. 2003).
 Legal Analysis
Zoghby contends that the trial court exceeded the scope of its discretion in ordering the discovery of his psychiatric records and reports because, he says, the documents are privileged pursuant to Rules 503 and 505, Ala. R. Evid. According to Zoghby, the trial court's order ignores the fact that "the Alabama Rules of Civil Procedure recognize the importance of preserving confidential relationships and confidential information arising therefrom by providing that privileged matters are not subject to discovery." See Ex parteRudder, 507 So.2d 411, 413 (Ala. 1987).
"Discovery matters are within the trial court's sound discretion, and this Court will not reverse a trial court's ruling on a discovery issue unless the trial court has clearly exceeded its discretion." Ex parte Ocwen Fed. Bank,FSB, 872 So.2d 810, 813 (Ala. 2003). "Whether a communication is privileged is a question of fact to be determined by the trial court from the evidence presented. . . ."Ex parte DCH Reg'l Med. Ctr., 683 So.2d 409, 412
(Ala. 1996). The standard for reviewing a trial court's ruling on a privilege issue is whether the trial court exceeded the scope of its discretion. Exxon Corp. v. Department ofConservation Natural Res., 859 So.2d 1096, 1103
(Ala. 2002).
Ledet and Zoghby both agree that the requested discovery was initially protected from disclosure by the psychotherapist-patient privilege. See Rule 503, Ala. R. Evid. Ledet and Zoghby, however, disagree on whether, by releasing the documents to Archbishop Lipscomb, Zoghby waived the psychotherapist-patient privilege.
Zoghby contends, however, that the documents are also protected from disclosure by the privilege accorded communications to the clergy because, he says, the release of the documents was made to Archbishop Lipscomb in his "professional capacity and in a confidential manner." Therefore, Zoghby maintains that Archbishop Lipscomb has "the privilege to refuse to disclose, and to prevent another from disclosing, that confidential communication." Rule 505(b), Ala. R. Evid.
Ledet argues that the clergyman privilege does not protect from disclosure the documents she seeks because, she says, at the time Zoghby authorized the documents to be released to Archbishop Lipscomb, Archbishop Lipscomb was not functioning in his professional capacity as Zoghby's spiritual advisor; rather, he was functioning in his administrative capacity as the investigator of Ledet's claims and the enforcer of the Archdiocese's agreement resolving Ledet's initial complaint against Zoghby.
"The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return."Trammel v. United States, 445 U.S. 40, 51,100 S.Ct. 906, 63 L.Ed.2d 186 (1980).
Rule 505(b), Ala. R. Evid., provides:
 "If any person shall communicate with a clergyman in the clergyman's professional *Page 321 
capacity and in a confidential manner, then that person or the clergyman shall have a privilege to refuse to disclose, and to prevent another from disclosing, that confidential communication."
Thus, for a communication with a clergyman to be privileged, the communication must be made 1) to a clergyman 2) "in the clergyman's professional capacity" and 3) "in a confidential manner." Rule 505(b), Ala. R. Evid.
Clergyman is defined in Rule 505(a)(1) as
 "any duly ordained, licensed, or commissioned minister, pastor, priest, rabbi, or practitioner of any bona fide established church or religious organization; the term `clergyman' includes, and is limited to, any person who regularly, as a vocation, devotes a substantial portion of his or her time and abilities to the service of his or her church or religious organization."
Additionally, "[a] communication is `confidential' if it is made privately and is not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." Rule 505(a)(2), Ala. R. Evid.
Rule 505, however, does not define the phrase "in the clergyman's professional capacity." Before the promulgation of Rule 505, Ala. R. Evid., the clergyman privilege was limited in scope to communications made in a confessional or of marital nature. See Santmier v. Santmier, 494 So.2d 95, 97
(Ala.Civ.App. 1986) (recognizing that the "priest-penitent" communication must involve "making a confession or seeking spiritual counsel or comfort or advice or help with a marital problem"). Rule 505, however, abrogated such limitations to the broader realm of communications made to a clergyman "in the clergyman's professional capacity." Thus, we must give effect to the words "in the clergyman's professional capacity."
 "`"[T]he construction of rules of court are for the court which promulgated them." Alabama Public Serv. Comm'n v. Redwing Carriers, Inc., 281 Ala. 111, 115, 199 So.2d 653, 656 (1967). "We start with the basic premise that words used in court rules must be given their plain meaning." Nieto v. State, 842 So.2d 748, 749 (Ala.Crim.App. 2002). In construing a rule promulgated by this Court, effect must be given to "each word, phrase, and clause." State v. Old West Bonding Co., 203 Ariz. 468, 471, 56 P.3d 42, 45 (Ct.App. 2002).'"
Ex parte Haynes Downard Andra Jones, LLP,924 So.2d 687, 692 (Ala. 2005) (quoting Southeastern Meats ofPelham, Inc. v. City of Birmingham, 895 So.2d 909, 913
(Ala. 2004)).
First, we consider the plain meaning of the words in the phrase "in the clergyman's professional capacity." A "profession" is "a calling requiring specialized knowledge and often long and intensive academic preparation." Merriam-Webster'sCollegiate Dictionary 991 (11th ed.2003). "Capacity" is defined as "duty, position, role." Merriam-Webster'sCollegiate Dictionary at 182. While "clergyman" is defined in Rule 505, the definition of "clergyman" in Rule 505 does not assist in determining the vocation of the clergy. "Clergy" is defined as "a group ordained to perform pastoral . . . functions" in a religious organization. Merriam-Webster'sCollegiate Dictionary at 230. "Pastoral" is defined as "of or relating to spiritual care or guidance esp. of a congregation." Merriam-Webster's Collegiate Dictionary
at 907.
In Nussbaumer v. State, 882 So.2d 1067
(Fla.Dist.Ct.App. 2004), the Florida Court of Appeals addressed the requirement in *Page 322 
Florida for the clergyman privilege to apply that the communication be made to a clergyman "in the usual course of his or her practice or discipline," which is similar to the requirement in Alabama that the communication be made to the clergyman "in the clergyman's professional capacity." Recognizing that the language "in the usual course of his or her practice or discipline" was made part of the requirement to expand the scope of the privilege beyond the traditional confessional, the court held that a communication with a pastor during pastoral counseling satisfied the requirement that the communication was made in the usual course of the pastor's practice.
In reaching its holding, the Nussbaumer court noted:
 "The clergy communications privilege does not apply unless the confider consults the member of the clergy `for the purpose of seeking spiritual counsel or advice.' § 90.505(1)(b) [Fla. Statutes (2003)]. No reported Florida decisions address this requirement of the privilege. Courts from other jurisdictions have interpreted similar statutory provisions to exclude from the operation of the privilege communications made for purposes not related to religious or spiritual concerns. E.g., Magar v. State, 308 Ark. 380, 826 S.W.2d 221 (1992) (finding privilege inapplicable to defendant's admission to minister's accusation of sexual abuse of minors where conversation was initiated by minister for disciplinary purposes and not for spiritual counseling); Burger v. State, 238 Ga. 171, 231 S.E.2d 769 (1977) (holding defendant could not claim privilege concerning conversational statements to clergy member who was his friend and frequent companion concerning defendant's intent to kill his wife and her lover); Keenan v. Gigante, 47 N.Y.2d 160, 417 N.Y.S.2d 226, 390 N.E.2d 1151
(1979) (finding privilege inapplicable to defendant's communications to priest where the communications were made for purpose of securing defendant's entrance into a work release program). The common thread in such cases `is that the privilege may not be invoked to enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happened to be a religious minister.' People v. Carmono, 82 N.Y.2d 603, 606 N.Y.S.2d 879, 627 N.E.2d 959, 962 (1993)."
882 So.2d at 1075.
Thus, considering the plain meaning of the words in the phrase "in the clergyman's professional capacity" and the observations of the Nussbaumer court, we hold that the phrase means that the clergyman is serving in his professional capacity when he is serving as a specialist in the spiritual matters of his religious organization. In other words, the communication must be made to the clergyman in his role as a provider of spiritual care, guidance, or consolation to the individual making the communication. Whether a communication is made to a clergyman "in the clergyman's professional capacity" must be examined on a case-by-case basis.
Our interpretation of this phrase is supported by the Advisory Committee's Note to Rule 505, which provides:
 "Section (b). General rule of privilege. The privilege arises only when the person communicates with a clergymen in the latter's professional capacity. A similar limitation is placed upon the attorney-client privilege when the client consults a lawyer for some purpose other than to secure legal advice. See Ala. R. Evid. 502(a)(1) advisory committee's notes.' Communications to the clergyman in furtherance of a crime or a fraud would not qualify as seeking spiritual *Page 323 advice and therefore would not fall within the protection of the privilege."
(Emphasis added.) See also Tankersley v. State,724 So.2d 557, 560 (Ala.Crim.App. 1998), quoting Advisory Committee's Notes to Rule 505 (stating that "Rule 505 has explicitly broadened the scope of the privilege to include `all conferences where the clergyman is consulted in the professional capacity of spiritual advisor in the broadest sense'").
Here, the parties do not dispute that Archbishop Lipscomb is a clergyman, nor do they dispute that the disclosure to Archbishop Lipscomb of the documents Ledet seeks was made in a confidential manner. Therefore, our analysis focuses on whether the documents were disclosed to Archbishop Lipscomb while he was acting in his professional capacity as a spiritual advisor.
The facts before us establish that at the time Zoghby authorized the release of the documents to Archbishop Lipscomb, Archbishop Lipscomb had dual roles in the church — as a priest and as an administrator in the Archdiocese. Other jurisdictions have confronted situations similar to this one — a privilege is asserted when a communication is made to a clergyman who is serving both as a spiritual advisor and as an administrator.
In Magar v. State, 308 Ark. 380, 826 S.W.2d 221
(1992), the Supreme Court of Arkansas held that the trial court properly admitted evidence from a pastor; the clergyman privilege did not apply because the communication did not occur while the pastor was serving as a spiritual counselor. InMagar, the parents of two boys told the pastor that Magar, who worked in the music ministry of the church, had sexually abused their sons. The pastor confronted Magar, and Magar admitted that the allegations were true. The court held that even though the pastor and Magar had had counseling sessions before the incident that was the basis of the action, the communication at issue was "disciplinary in nature" and, therefore, was not protected by the privilege.
The Arkansas Supreme Court emphasized that each analysis of the applicability of the clergyman privilege must rest on the facts of the particular case, stating:
 "Other courts have considered the privilege of religious communications and determined the applicability of the privilege on the facts of each case. Illustrative of the rationale denying the privilege are United States v. Gordon, 493 F.Supp. 822 (N.D. New York 1980) (citing Trammel v. United States, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)) (it was emphasized that the privilege between priest and penitent is limited to private communications, a privilege recognizing `the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return,' which facts and circumstances were not present where the challenged conversations related to business matters), and Burger v. State, 238 Ga. 171, 231 S.E.2d 769
(1977) (the ministerial privilege was not applicable to testimony of reverend, as witness for the state in a homicide prosecution, relating to conversational statements made to him by the defendant regarding the defendant's intent to kill his wife where the record showed that the statements by the defendant to which the witness testified were not made by the defendant in professing religious faith or seeking spiritual comfort or guidance).
 "In comparison, the privilege was upheld in People v. Reyes, 144 Misc.2d 805, 545 N.Y.S.2d 653 (Supp. 1989), where a *Page 324 
conversation between a priest and the defendant was a privileged communication, which the priest could not testify about before a grand jury, where the defendant was seeking some type of spiritual advice from the priest with the reasonable expectation that the conversation would be kept secret when the defendant went to the priest's church after a shooting."
308 Ark. at 383-84, 826 S.W.2d at 223.
In Bonds v. State, 310 Ark. 541, 837 S.W.2d 881
(1992), the Supreme Court of Arkansas again addressed the clergyman privilege, holding that the privilege did not apply to an admission by Bonds when the minister, who was also Bonds's employer, telephoned Bonds to determine if the allegations that Bonds had sexually abused a 13-year-old girl were true and if he should fire Bonds. The court held that because at the time of the communication there was no evidence of an ongoing counseling relationship between the minister and Bonds and the minister was acting as Bonds's employer, the minister was not acting in his professional capacity as a spiritual advisor, and the clergyman privilege did not apply.
In State v. Guthrie, 627 N.W.2d 401 (S.D. 2000), the Supreme Court of South Dakota held that not every communication to a clergyman was privileged under South Dakota's clergy privilege, which provides an individual with a privilege to prevent disclosure of confidential statements made to a member of the clergy in his or her professional capacity as a spiritual advisor. In Guthrie, the communication occurred between an executive presbyter pastor and a subordinate pastor about an extramarital affair of the subordinate pastor. The court first focused on the subordinate pastor's intent in communicating with the executive presbyter pastor. The court concluded that although the subordinate pastor intended his conversation with the executive presbyter pastor to remain in confidence, the communication was not privileged because the evidence established that the communication was not made by the subordinate pastor when he was seeking spiritual advice or counseling from the executive presbyter pastor. The evidence established that the communication was made to assist the executive presbyter pastor in determining whether he should allow the subordinate pastor to continue in his position at the church. The court focused on the fact that the executive presbyter pastor initiated the communication about the subordinate pastor's affair and that after the communication the executive presbyter pastor permitted the subordinate pastor to remain in his position at the church. Because the facts established that when the communication was made the subordinate pastor was not seeking spiritual advice and the executive presbyter pastor was acting in his supervisory capacity, the court held that the communication was not privileged.
In Kos v. Texas, 15 S.W.3d 633 (Tex.App. 2000), a case whose facts are similar to those in the case before us, the Texas Court of Appeals addressed whether the trial court properly admitted testimony from a Catholic priest regarding a communication the priest had had with another Catholic priest who had been accused of sexual misconduct. The accused priest claimed that the communication was privileged under the Texas clergyman privilege, which provides that confidential communications made by an individual to a clergy member in his professional capacity as a spiritual advisor are privileged. The communication occurred when the priest in his role as intervenor in cases where child abuse had been alleged confronted the accused priest about the abuse allegations. *Page 325 
The priest testified that the communications with the accused priest were not part of a "Catholic confession" by the accused priest and that the accused priest was not seeking spiritual advice. The priest further stated that at the time of the meeting he was not concerned about the state of the accused priest's soul but was focusing on conducting a "disciplinary intervention." The Texas Court of Appeals held that the communications were not privileged, stating:
 "[The priest's] testimony indicates the statements [the accused priest] made during the September 1992 meeting were not made in an effort to obtain some sort of spiritual advice or guidance; to the contrary, the meeting was more in the nature of a disciplinary/administrative meeting, with [the priest] attempting to determine what to do in the face of the abuse allegations. We note, in this regard, that the communications between [the accused priest] and [the priest] were not initiated by [the accused priest]; rather, they were initiated by [the priest] for the specific purpose of obtaining information about the abuse allegations. Although it is true that [the clergyman-privilege rule] does not require for its application that the communicant be the one seeking, summoning, or soliciting the presence of the clergy, see Nicholson v. Wittig, 832 S.W.2d 681, 687 (Tex.App.-Houston [1 Dist.] 1992, orig. proceeding), it nevertheless does require that the communications be made for the purpose of obtaining spiritual guidance or consolation. Because there was evidence presented to the trial court indicating that the communications at issue were not motivated by any religious or spiritual considerations, we conclude the trial court could properly have found that [the accused priest's] statements were not addressed to [the priest] in his `professional character as a spiritual advisor.' See Tex.R. Evid. 505(b). Under these circumstances, we conclude the trial court did not abuse its discretion in (1) concluding the subject statements were not privileged under rule 505, and (2) admitting the evidence at trial."
15 S.W.3d at 640.
Here, the trial court was faced with the factual question of whether the documents were released to Archbishop Lipscomb in Archbishop Lipscomb's professional capacity as Zoghby's spiritual advisor or in the course of Archbishop Lipscomb's resolution of Ledet's complaint against Zoghby. Zoghby averred in his affidavit that he released the documents to Archbishop Lipscomb "to assist the Archbishop in giving [him] personal and spiritual guidance"; evidence offered by Ledet established otherwise. Archbishop Lipscomb's deposition testimony refutes Zoghby's statement. Archbishop Lipscomb's testimony established that before, during, and after the investigation into Ledet's complaint against Zoghby, he was not acting as Zoghby's spiritual advisor but as an investigator looking into Ledet's allegations and a resolver of her complaint. Indeed, Arch-bishop Lipscomb's testimony establishes that the counseling with Zoghby about his sexual misconduct was conducted in New York and that he used the documents from that counseling that Zoghby released to him as a major factor in deciding to promote Zoghby to the position of pastor. Zoghby does not deny that when he released the documents to Archbishop Lipscomb it was for the purpose of assisting Archbishop Lipscomb in determining whether Zoghby had "changed his life" and was ready to return to active ministry. Given the totality of the facts in this case, the trial court's conclusion that the privilege does not apply is supported by evidence indicating that the documents Ledet *Page 326 
seeks were released by Zoghby to Archbishop Lipscomb not for the purpose of Zoghby's receiving spiritual advice from Archbishop Lipscomb, but for the purpose of Zoghby's establishing his compliance with the Archdiocese's agreement with Ledet and his readiness to return to active ministry. Thus, Zoghby has not established that the trial court exceeded the scope of its discretion in this matter and has not established that he has a clear legal right to the relief requested.
Zoghby further argues that, even if his records are not protected by the clergyman privilege, the documents remain protected by the psychotherapist-patient privilege because, he says, he did not "objectively manifest a clear intent not to rely on the [psychotherapist-patient] privilege." Ex parteUnited Serv. Stations, Inc., 628 So.2d 501, 505 (Ala. 1993). See Ex parte Pepper, 794 So.2d 340 (Ala. 2001); Exparte T.O., 898 So.2d 706 (Ala. 2004). Zoghby's argument, however, ignores the fact that he expressly released the documents to Archbishop Lipscomb. In his affidavit he admits that he signed "a release authorizing [his] counselor to send to and give the Archbishop access to [his] counseling records." As previously noted, nothing before us establishes that Zoghby did not intend for the documents to be used to assist in evaluating his readiness to return to active ministry. This express release, which the circumstances establish was for purposes other than counseling or treatment, objectively manifests Zoghby's clear intent not to rely on the psychotherapist-patient privilege. Therefore, Zoghby has not established that the trial court exceeded the scope of its discretion in holding that these documents are not protected from disclosure.
Lastly, the trial court's discovery order is tailored to protect the contents of these documents and to prevent unnecessary dissemination of what they contain. The order specifically provides that the documents are to be produced "solely for the purpose of discovery" and that the documents are bound from further disclosure by the parties' nondisclosure agreement. In light of the facts of this case, the trial court's restrictions adequately protect Zoghby's rights.
 Conclusion
In light of the pleadings and facts before us, Zoghby has not established that the trial court exceeded the scope of its discretion in compelling the discovery. Consequently, Zoghby has not established a clear legal right to the relief requested; this petition therefore is denied.
PETITION DENIED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, and BOLIN, JJ., concur.
LYONS, J., concurs specially.
PARKER, J., dissents.
[1] Archbishop Lipscomb is the Archbishop of the Catholic Archdiocese of Mobile and acts as the administrative and spiritual head of the Archdiocese. Chancellor Farmer is the Chancellor of the Archdiocese and acts as an administrative and spiritual executive for the Archdiocese.