OPINION
 

 NORRIS, Judge.
 

 ¶ 1 This special action arises out of the trial court’s denial of a motion filed by petitioner-defendant Korri Lee Waters to suppress testimony under the clergy-penitent privilege statute applicable in criminal prosecutions, Arizona Revised Statutes (“A.R.S.”) § 13-4062(3) (Supp.2004). The statute provides that, under certain circumstances, a confession made to a “clergyman” is privileged.
 
 Id.
 
 The trial court denied Waters’ motion, finding she had not communicated with a “clergyman.” Waters argues the trial court applied the wrong legal standard in making this determination.
 

 ¶ 2 We accepted jurisdiction, but denied relief with this opinion to follow. We hold that whether a person is a clergyman of a particular religious organization under A.R.S. § 13-4062(3) should be determined by that organization’s ecclesiastical rules, customs and laws. Applying this standard here, we agree with the trial court that Waters’ communications were not with a clergyman.
 

 SPECIAL ACTION JURISDICTION
 

 ¶ 3 Special action jurisdiction is discretionary.
 
 Roman Catholic Diocese v. Superior Court,
 
 204 Ariz. 225, 227, ¶ 2, 62 P.3d 970, 972 (App.2003). Such jurisdiction is appropriate when “there is no plain, speedy and adequate remedy by way of appeal” or “in cases involving a matter of first impression, statewide significance, or pure questions of law.”
 
 Id.
 
 The issue raised by Waters and decided in this special action — the meaning of clergyman under A.R.S. § 13-4062(3) — is one of law, statewide significance and first impression. Special action jurisdiction is, therefore, appropriate.
 

 FACTS
 

 ¶ 4 In November 2003, Waters was indicted on one count of sexual conduct with a minor, a 16 year-old boy, a class 6 felony. In May 2004, during the pendency of her criminal case, Waters sent an e-mail to “Minister” D.W., the volunteer music director at Church on the Word, a Glendale, Arizona non-denominational Christian church. D.W.’s title was honorific, given to her and others within the church to differentiate them from other church officers and as a sign of respect. Waters had been an active member of the church and had developed a close friendship with D.W. Over several years the two women sang together on the church’s “worship team” and discussed Waters’ marriage and “things” that friends talk about.
 

 ¶ 5 In her e-mail to D.W., Waters wrote she missed the church, asked for forgiveness for the “choice” she had made, explained she wanted her life back and stated she was “hungry to hear the word____” She asked for advice on how to start over. Not knowing how to respond, D.W. forwarded Waters’ e
 
 *372
 
 mail to the church’s minister, Pastor D.M., and asked him what she should say. With guidance from Pastor D.M., D.W. answered Waters’ e-mail and told her that to obtain deliverance she would need to “come clean” about what she had done.
 

 If you truly want deliverance in your life, total and complete deliverance, you have [to] come clean about what you did. Everything.
 

 I want to help you. Your first step is to tell me exactly what you did, what’s going on now, what your plan is for the future. As far as getting your life back, you don’t want the life you had before. You need something better. A life that is solid and secure, without shame. It starts by telling the truth. The whole truth. The ball is in your court.
 

 ¶ 6 Having been told by D.W. to tell her what she had done, Waters did exactly that. In a subsequent e-mail, Waters acknowledged her relationship with the minor, discussed its evolution and described it in graphic detail. D.W. forwarded this and other e-mails from Waters to Pastor D.M. who gave them to the minor’s parents. The parents turned the e-mails over to the prosecutor in Waters’ criminal case.
 

 ¶ 7 Asserting D.W. had acted as a “person of the clergy” and had provided her with religious counseling, Waters moved to prevent the prosecution from calling D.W. as a witness to bar her from testifying about the e-mails. Waters argued her communications with D.W. were privileged under A.R.S. § 13-4062(3), the clergy-penitent privilege statute applicable in criminal proceedings. Section 13-4062(3) prohibits the examination of
 

 [a] clergyman or priest, without consent of the person making the confession, as to any confession made to the clergyman or priest in his professional character in the course of discipline enjoined by the church to which the clergyman or priest belongs.
 

 ¶ 8 The trial court held an evidentiary hearing on Waters’ motion. D.W. testified. She explained she was not an ordained minister, did not receive confessions and referred questions regarding church doctrine and policies to Pastor D.M. As the church’s music director, she directed the choir, selected and arranged worship service music and occasionally delivered the “message” or “teaching” during worship services when Pastor D.M. was out of town. D.W. acknowledged her past friendship with Waters, but explained Waters had never before asked her for advice about “something like deliverance from sin.” D.W. also stated this was the first time anyone had ever asked her for this type of advice.
 
 [1]
 

 ¶ 9 Waters also testified. She explained she believed D.W. was a minister and had confided in her as a minister, believing her emails would remain private (except from Pastor D.M.) because D.W. was a minister. She asserted that in the past she had confided in D.W. about her marriage and had sought her counsel as a minister.
 

 ¶ 10 The trial court denied Waters’ motion. It ruled she was not entitled to claim the privilege, finding D.W.’s “honorary title, job description and volunteer status [did not fit] the definition of ‘clergy’” contained in the statute. The court held there “must be a more formal religious recognition of status, such as an ordained minister, priest, rabbi, etc____ A volunteer musical director and non-ordained minister does not fit into this category.”
 
 [2]
 

 
 *373
 
 ¶ 11 Waters then petitioned this Court for relief and asked us to reverse the trial court’s denial of her motion. We accepted jurisdiction, but denied the relief requested,
 

 DISCUSSION
 

 ¶ 12 A confession is privileged from disclosure under A.R.S. § 13 — 4062(3) if it is “made to the clergyman or priest in his professional character in the course of discipline enjoined by the church to which the clergyman or priest belongs.” The privilege afforded by the statute belongs to the communicant: a clergyman may not disclose the communicant’s confidences without the communicant’s consent.
 
 Church of Jesus Christ of Latter-Day Saints v. Superior Court,
 
 159 Ariz. 24, 28, 764 P.2d 759, 763 (App.1988) (construing clergy-penitent privilege statute applicable in civil cases, A.R.S. § 12-2233).
 
 [3]
 
 At issue in this special action is the meaning of “clergyman,” which the statute does not define.
 

 ¶ 13 Waters asserts here, as she did in the trial court, the privilege should be expansively defined, and should not be limited to formally ordained clergy.
 
 [4]
 
 She argues that clergyman should be defined in a functional manner, and clerical status should be accorded to members of a religious organization who engage in functions akin to or customarily performed by members of the clergy. Calling such individuals “functionaries,” she also contends that functionary and thus clerical status should be extended to individuals the communicant reasonably believes are acting as functionaries. Under her functionary equals clergyman definition, Waters’ communications with D.W. would be privileged because Waters sought religious advice from DW.; DW. responded with spiritual counsel — -just as a clergyman would; and Waters reasonably believed D.W. was, as befitting her honorific title, acting as a member of the clergy in providing that advice.
 

 ¶ 14 In support of her argument, Waters relies on clergy-penitent privilege rules or statutes from other jurisdictions that include such functionaries within the privilege. Rule 505(a) of the Texas Rules of Evidence is illustrative. The Texas rule defines “member of the clergy” as a minister, priest, rabbi, accredited Christian Science Practitioner, or “other similar religious functionary of a religious organization or an individual reasonably believed so to be by the person consulting with such individual.” Similar or identical to the Texas rule are Alaska Rules of Evidence 506(a)(1); Arkansas Rules of Evidence 505(a)(1); Delaware Rules of Evidence 505(a)(1); Hawaii Rules of Evidence 506(a)(1); Kentucky Rules of Evidence 505(a)(1); Oklahoma Statutes Annotated title 12, § 2505(A)(1) (West 2004); and Wisconsin Statutes Annotated § 905.06 (West 2003).
 

 ¶ 15 The Texas definition of “member of the clergy” is modeled after the definition of clergyman in the clergy-penitent privilege rule included in the original draft of the Federal Rules of Evidence. See Proposed Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183 (1973).
 
 [5]
 
 Congress did not codify the draft privilege rules.
 
 See
 
 H.R. 93-650 (1973), S.Rep. 93-1277 (1974), H.R.Conf.Rep. 93-1597 (1974),
 
 reprinted in
 
 1974 U.S.C.A.A.N. 7051, 7052-53.
 
 [6]
 
 The Advisory Committee note to the proposed rule explained:
 

 
 *374
 
 A fair construction of the language requires that the person to whom the status is sought to be attached be regularly engaged in activities conforming at least in a general way with those of a Catholic priest, Jewish rabbi, or minister of an established Protestant denomination, though not necessarily on a full-time basis.
 

 Proposed Rules of Evidence, 56 F.R.D. at 247-48.
 

 ¶ 16 The approach to clerical status taken by the drafters of the proposed federal rule and by the states adopting that approach has been criticized by some commentators as being “imprecise.” 26 Charles Alan Wright, Arthur R. Miller & Kenneth W. Graham, Jr.,
 
 Federal Practice & Procedure
 
 § 5614 (2004). We agree. Indeed, almost anyone in a religious organization willing to offer what purports to be spiritual advice would qualify for clergy status. Such an expansive construction is contrary to how Arizona courts interpret privilege statutes. Generally, such statutes are to be restrictively interpreted. This is because they impede the truth-finding function of the courts.
 
 Church of Jesus Christ of Latter-Day Saints,
 
 159 Ariz. at 29, 764 P.2d at 764. Further, such an approach is not sufficiently linked to achieving the societal benefits justifying the existence of the clergy-penitent privilege.
 

 ¶ 17 The clergy-penitent privilege recognizes the “human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.”
 
 Trammel v. United States,
 
 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). As we have recognized, the privilege is a “legislative response ‘to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one’s self and others can be realized.’ ”
 
 Church of Jesus Christ of Latter-Day Saints,
 
 159 Ariz. at 31, 764 P.2d at 766
 
 (quoting Keenan v. Gigante,
 
 47 N.Y.2d 160, 417 N.Y.S.2d 226, 390 N.E.2d 1151, 1154 (1979)).
 

 ¶ 18 Thus, the privilege exists because of a belief that people should be encouraged to discuss their “flawed acts” with individuals who, within the spiritual traditions and doctrines of their faith, are qualified and capable of encouraging the communicants to abandon and perhaps make amends for wrongful and destructive behavior. The privilege should not be expanded to include communications with individuals who are not qualified to provide such advice. As this case demonstrates, D.W.’s honorific title and activities in the church did not qualify her to render this type of counsel and encouragement or to even advise on issues of transcendent belief, repentance and forgiveness. Therefore, we decline to adopt Waters’ functional test for determining the meaning of clergyman.
 

 ¶ 19 Nevertheless, we agree with Waters the term “clergyman” in A.R.S. § 13-4062(3) is not limited to members of religious organizations having an ordained clergy.
 
 [7]
 
 Such a restrictive definition would raise serious concerns under the Establishment Clause of the First Amendment to the United States Constitution. This clause, applicable to the states through the Fourteenth Amendment to the Constitution, provides that “Congress shall make no law respecting an establishment of religion____” U.S. Const. amend I. “The clearest command of the Establishment Clause [of the First Amendment] is that one religious denomination cannot be officially preferred over another.”
 
 Larson v. Valente,
 
 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982);
 
 see also Kotterman v. Killian,
 
 193 Ariz. 273, 277, ¶ 2, 972 P.2d 606, 610 (1999). We disagree, therefore, with the trial court insofar as it concluded the clergy-penitent privilege only applies to communications with ordained clergy.
 

 ¶ 20 Consistent with the Establishment Clause’s emphasis on “denominational neutrality,”
 
 Larson,
 
 456 U.S. at 246, 102 S.Ct. 1673, in cases involving issues of clergy status and church governance, we have recognized a minister’s relationship with his or her
 
 *375
 
 church “implicates” internal church discipline, faith, and organization and such issues should be governed by “ecclesiastical rule, custom and law.” Thus, in
 
 Dobrota v. Free Serbian Orthodox Church “St. Nicholas”,
 
 191 Ariz. 120, 124-25, 952 P.2d 1190, 1194-95 (App.1998), we explained that a priest’s employment relationship with his church and disputes arising out of that relationship should be governed by these principles. And, in
 
 Rashedi v. General Board of Church of the Nazarene,
 
 203 Ariz. 320, 323, ¶ 14, 54 P.3d 349, 352 (App.2002), we explained that whether a person is qualified to be a clergy member of a particular faith is a matter to be determined by the procedures and dictates of that person’s faith.
 

 ¶ 21 Clergy status under A.R.S. § 13-4062(3) should be determined in the same manner. Thus, for purposes of the statute, we hold that whether a person is a clergyman of a particular religious organization should be determined by that organization’s ecclesiastical rules, customs and laws.
 
 [8]
 
 Such an approach avoids denominational favoritism and is consistent with the aims of the clergy-penitent privilege.
 

 ¶ 22 This approach parallels the other requirements of the statute. Section 13-4062(3) requires the confession to be made to a clergyman “in his professional character” and “in the course of discipline enjoined by the church to which the clergyman or priest belongs.” Members of the clergy often participate in administrative, social, commercial or other non-religious activities, and not all communications with a cleric should be privileged. The “professional character” element requires the communication to be directed to a clergyman in his or her capacity as a spiritual leader within his or her religious denomination.
 
 Scott,
 
 870 P.2d at 955-56;
 
 State v. Martin,
 
 137 Wash.2d 774, 975 P.2d 1020, 1026 n. 65 (1999).
 

 ¶ 23 The “in the course of discipline enjoined by the church” requirement refers to the duties and obligations of the clergyman and the rules and customs of the cleric’s faith. “[T]he clergy member receiving the confidential communication [must] be enjoined by the practices or rules of the clergy member’s religion to receive the confidential communication and to provide spiritual counsel.”
 
 State v. Martin,
 
 91 WashApp. 621, 959 P.2d 152, 157 (1998),
 
 aff’d,
 
 137 Wash.2d 774, 975 P.2d 1020, 1028 (1999). When joined with the clergyman requirement, these additional requirements protect only those communications anchored in the ecclesiastical rules, customs and laws of the applicable religious group.
 

 ¶ 24 Applying this approach here, D.W. was not a clergyman, and Waters’ communications with her were not privileged. Based on the evidence presented to the trial court, D.W. was not, in accordance with the church’s ecclesiastical rules, customs and laws, a clergyman. She served as the church’s music director. She did not serve as its pastor. With the sole exception of Waters, members of the church did not go to D.W. for spiritual advice. They did not seek D.W.’s religious counsel. She did not handle questions of church doctrine and policy, and instead, referred all such matters to Pastor D.M.
 

 ¶ 25 Finally, we disagree with Waters’ argument that the trial court should have suppressed D.W.’s testimony because Waters testified she reasonably believed D.W. was a minister. Although a trial court might need to assess the reasonableness of a communicant’s belief when faced with a legitimate dispute regarding a denomination’s rules, customs and laws, no such situation was presented here.
 
 [9]
 
 First, D.W. never claimed to
 
 *376
 
 be a cleric. And second, on the record presented, the court found Waters’ belief unreasonable: “[Waters] was a member of the church for several years. It is reasonable to assume that she was aware of [D.W.’s] status as a volunteer____” The trial court’s factual finding was amply supported by the record.
 

 CONCLUSION
 

 ¶ 26 The trial court properly denied Waters’ motion to suppress D.W.’s testimony. For the foregoing reasons, we deny relief.
 

 CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge and PATRICK IRVINE, Judge.
 

 [1]
 

 . D.W. testified that the types of questions she typically handled were of the "do you know anybody that does babysitting,” "do you have any way to help me find a job," and who can "I talk to ... about my kids” variety.
 

 [2]
 

 . The trial court found the church did not recognize or have a procedure for the absolution of sin or for confession. Consequently, the trial court ruled the substance of the communications between Waters and D.W. did not amount to a "confession” made “in the course of discipline enjoined by the church.” Because we resolve this special action on another ground, we do not need to decide whether the statute is limited only to penitential confessions. Instead, we have assumed for present purposes that Waters’ communications with D.W. qualified for the protections afforded by the statute. We note, however, that many courts have construed the term "confession” in light of the particular doctrine or discipline of the church to which the cleric belongs and have held the confession requirement includes communications made in the course of religious counseling, guidance and admonish
 
 *373
 
 ment.
 
 E.g., State v. MacKinnon,
 
 288 Mont. 329, 957 P.2d 23, 28 (1998); Scott v.
 
 Hammock,
 
 870 P.2d 947, 954 (Utah 1994). These courts have also recognized that a narrow construction of the confession requirement so that only penitential communications would be protected would raise First Amendment concerns.
 
 See Scott,
 
 870 P.2d at 954.
 

 [3]
 

 . In all material respects, A.R.S. § 12-2233 (Supp.2004) is identical to A.R.S. § 13-4062(3).
 

 [4]
 

 . Waters does not describe or define what she means by ordination. However, ordination is commonly understood as referring to an individual’s appointment or admission to the ministry of a religious organization. The Oxford English Dictionary 913 (2d ed.1989).
 

 [5]
 

 . Proposed Rule 506(a)(1) defined clergyman as "a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.”
 

 [6]
 

 . Congress substituted a single rule generally providing that ”privilege[s] ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.” Fed.R.Evid. 501.
 

 [7]
 

 . For example, the Church of Christ, Scientist does not have an ordained clergy.
 
 Cox v. Miller,
 
 296 F.3d 89, 105 (2d Cir.2002).
 

 [8]
 

 . The significance we attach to a religious organization's ecclesiastical rules, customs and laws in determining clerical status under A.R.S. § 13-4062(3) corresponds to the state legislature's decision to allow a cleric to "withhold" reporting information concerning alleged child abuse if the cleric determines it is “reasonable and necessary [to do so] within the concepts of the religion.” A.R.S. § 13-3620(A) (2004).
 

 [9]
 

 . The reasonableness of a communicant’s belief might also be relevant if the recipient of the communication was an imposter.
 
 See State v. Boobar,
 
 637 A.2d 1162, 1170 (Me.1994) (clergy privilege statute protecting communications if communicant reasonably believed recipient was a cleric was designed to protect disclosures made to imposters or persons otherwise misrepresenting themselves as a member of the clergy).