IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

MARIO RODRIGUEZ-RAMIREZ, *Petitioner*,

*v.*

STATE OF ARIZONA,
*Respondent.*[1]

No. 1 CA-SA 23-0182

FILED 04-29-2025

Petition for Special Action from the Superior Court in Maricopa County
No. CR2021-101028-001
The Honorable Kristin Culbertson, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED; REMANDED**

COUNSEL

Ballecer & Segal, LLP, Phoenix
By Natalee Segal, Nicholas Bustamante
*Counsel for Defendant*

Blackwell Law Office, PLLC, Phoenix
By Jocquese Blackwell
*Co-Counsel for Defendant*

---

[1] The court amended the caption to reflect the naming conventions now reflected in Rule 5(b), Arizona Rules of Procedure for Special Actions (2025). All future filings shall reflect this change.

Maricopa County Attorney's Office, Phoenix
By Quinton S. Gregory
*Counsel for Real Party in Interest*

Coppersmith Brockelman PLC, Phoenix
By Austin C. Yost and Andrew T. Fox
*Counsel for Amicus Curiae AZ Attorneys*

First Liberty Institute, Plano Texas
By Andrew W. Gould
*Counsel for Amicus Curiae First Liberty*

Arizona Attorney General's Office, Phoenix
By Ashley Torkelson Levine
*Counsel for Amicus Curiae, Arizona Attorney General*

Maricopa County Public Defender's Office, Phoenix
By Mikel Steinfeld and Kristen Reller
*Counsel for Amicus Curiae, Maricopa County Public Defender*

---

**OPINION**

Chief Judge David B. Gass delivered the opinion of the court, in which Presiding Judge Michael J. Brown and Judge Andrew M. Jacobs joined.

---

**G A S S**, Chief Judge:

¶1        Petitioner Mario Rodriguez-Ramirez, a pastor, challenges the superior court's order denying his motion to suppress evidence of his statements to a co-pastor. The superior court ruled the surreptitiously recorded conversation between Rodriguez-Ramirez, a pastor, and a co-pastor at the same church, was admissible after finding the clergy-penitent privilege under A.R.S. § 13-4062.3 did not apply.

¶2        We accept special action jurisdiction and grant relief. On *de novo* review, we conclude the clergy-penitent privilege applies to Rodriguez-Ramirez's confession. In doing so, we focus our analysis on whether allegedly privileged clergy-penitent communications are privileged and thus inadmissible at trial. We remand for further proceedings consistent with this opinion.

2

## SPECIAL ACTION JURISDICTION

¶3　　　　When the superior court overrules a privilege objection, the party asserting the privilege has no equally plain, speedy, or adequate remedy by appeal. *See Ariz. Indep. Redistricting Comm'n v. Fields*, 206 Ariz. 130, 135 ¶ 11 (App. 2003). Rodriguez-Ramirez's special action also raises issues of first impression of statewide importance, for which special action review is appropriate. *Id.* We thus exercise our discretion and accept special action jurisdiction. *See* Ariz. R.P. Spec. Act. 8(a) (2024); *see also* Ariz. R.P. Spec. Act. 12(a)–(b)(2), (4) (2025).

## FACTUAL AND PROCEDURAL HISTORY

¶4　　　　Rodriguez-Ramirez was a pastor at a Phoenix church. A co-pastor helped Rodriguez-Ramirez lead the church. The 2 had known each other since they were young and were friends for more than 30 years. And the co-pastor was married to Rodriguez-Ramirez's sister.

¶5　　　　At some point, Rodriguez-Ramirez was accused of engaging in sexual activity with the alleged victim, the co-pastor's niece, who was a minor at the time. The alleged victim was unrelated by blood to Rodriguez-Ramirez. In late 2021, the State indicted Rodriguez-Ramirez for sexual offenses against the alleged victim.

¶6　　　　In May 2020, after the accusations surfaced but before the indictment, Rodriguez-Ramirez and the co-pastor agreed to meet to discuss the accusations. Because of COVID-19 protocols in place then, they met at a park. The co-pastor recorded the conversation without Rodriguez-Ramirez's knowledge or consent. Later, the co-pastor distributed the recording to families in Rodriguez-Ramirez's church and to a pastor from another church of the same denomination. The record does not reveal when or how police obtained the recording.

¶7　　　　Defense counsel raised the issue, and the superior court ordered briefing. Rodriguez-Ramirez asked the superior court to suppress the recording and transcript, arguing it was privileged and he never waived the privilege. The State argued the conversation was not privileged, but the State did not assert a waiver.

¶8　　　　Defense counsel did not limit his briefing on the suppression motion to the circumstances of the alleged confession. Rather, he referred to some of the conversation's content to support the motion. The State's briefing focused on the circumstances of the conversation and the familial and personal relationship between Rodriguez-Ramirez and the co-pastor.

The State's discussion of the substance of the conversation was limited to 2 concluding lines: "At no point does [Rodriguez-]Ramirez say he understands this will be a secret or confidential conversation. There is discussion of [Rodriguez-]Ramirez leaving the church broadly."

¶9            During a 2-day suppression hearing, the superior court heard testimony from the co-pastor and Rodriguez-Ramirez. Without objection, the State also provided the court a transcript and audio copy of the recording. During questioning, both sides used the content of the conversation to support their positions. Even so, defense counsel made it clear evidence of the communications between his client and the co-pastor was pertinent only for purposes of the evidentiary hearing, and his client was not waiving the privilege. Both the State and the superior court agreed Rodriguez-Ramirez could testify without waiving the privilege.

¶10           The superior court concluded the co-pastor was a member of the clergy under A.R.S. § 13-4062.3. The superior court then focused on whether Rodriguez-Ramirez made the confession when the co-pastor was acting in a "professional character" and concluded the co-pastor was not. The superior court explained, "The most credible and compelling evidence is the transcript of the . . . conversation," also making 6 other specific findings about the topics Rodriguez-Ramirez and the co-pastor discussed, including some of Rodriguez-Ramirez's statements. The superior court did not resolve whether the confession was made "in the course of discipline enjoined by the church." *Id.* Ultimately, the superior court concluded, "Given the totality of the circumstances, [Rodriquez-Ramirez]'s claimed belief that he thought the admissions made to [the co-pastor] were confidential and for the purpose of spiritual guidance is not reasonable."

## ANALYSIS

¶11           Whether a privilege exists is a question of law and is subject to *de novo* review. *State ex rel. Adel v. Adleman*, 252 Ariz. 356, 360 ¶ 10 (2022) (addressing attorney-client privilege); *see also State v. Archibeque*, 223 Ariz. 231, 234 ¶ 5 (App. 2009) (addressing clergy-penitent privilege). But the court applies an abuse of discretion standard when reviewing "any necessary fact finding conducted by the trial court in order to resolve these issues." *Archibeque*, 223 Ariz. at 234 ¶ 5.

¶12           Arizona's legislature established the statutory clergy-penitent privilege applicable to criminal matters. A.R.S. § 13-4062.3. "A clergyman or priest [shall not be examined as a witness], without consent of the person making the confession, as to any confession made to the clergyman or priest

4

in his professional character in the course of discipline enjoined by the church to which the clergyman or priest belongs." *Id.* The legislature used identical language to establish the clergy-penitent privilege applicable to civil matters. *See* A.R.S. § 12-2233.

¶13 "A privilege in the law of evidence is a right which a person has in a given instance to prevent the revelation of otherwise material and relevant evidence." *Church of Jesus Christ of Latter-Day Saints v. Superior Ct.*, 159 Ariz. 24, 28 (App. 1988) (citation omitted). "As we have recognized, the [clergy-penitent] privilege is a legislative response to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one's self and others can be realized." *Waters v. O'Connor*, 209 Ariz. 380, 384 ¶ 17 (App. 2004) (quotations omitted). The clergy-penitent privilege protects the "human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

## I.    In limited circumstances, a court may consider the content of allegedly clergy-penitent privileged communications to determine whether the privilege applies.

¶14 The superior court never expressly addressed whether it found it was necessary and appropriate to review the recording and, if so, for what purpose. *See McGlothlin v. Astrowsky*, 255 Ariz. 449, 457 ¶ 21 (App. 2023). But the superior court was not required to make that finding here because, as the privilege holder, Rodriguez-Ramirez expressly gave the court permission to review the recording's contents.

¶15 The Arizona Supreme Court has said, "the *court* may not invade the privilege to determine its existence, even in camera using a special master." *Clements v. Bernini*, 249 Ariz. 434, 438 ¶ 1 (2020) (emphasis added). Instead, a court generally should resolve privilege disputes by examining the circumstances—not the content—of the allegedly privileged communications. *Cf. Adleman*, 252 Ariz. at 362–63 ¶¶ 20–22 (holding the parties and the court prematurely used and considered the communication's content in addressing privilege and remanding to relitigate the privilege issue "based on the circumstances of the communications rather than [their content]").

¶16 Even so, the superior court may consider the content under limited circumstances. *McGlothlin*, 255 Ariz. at 457–58 ¶¶ 21–24. After the

Arizona Supreme Court's rulings in *Clements* and *Adleman*, this court issued *McGlothlin* and recognized a 3-step burden-shifting framework to determine if the superior court should examine the contents of privileged information. *Id. McGlothin* held the superior court may review content if: (1) the privilege holder makes a *prima facie* showing the privilege applies, (2) the party contesting the privilege makes a "factual showing to support a reasonable, good faith belief that the document is not privileged," and (3) a review is necessary to resolve the dispute. *Id.*

**¶17**         But the *McGlothlin* framework does not apply when the privilege holder expressly agrees to the superior court's review of the allegedly privileged materials' contents. For example, in *Clements*, the superior court appointed a special master to conduct an in camera review of the contents of jail calls at the State's request and over objections by Clements, the privilege holder. 249 Ariz. at 439 ¶¶ 4–6. The Arizona Supreme Court explained the superior court may not conduct an in camera review of potentially privileged jail calls received by the State until the superior court determines whether such review is necessary. *Id.* at 441 ¶ 16. Similarly, in *McGlothlin*, this court ruled the superior court erred when it conducted an in camera review even though no party requested or objected to the review. 255 Ariz. at 455 ¶ 8, 456 ¶ 16.

**¶18**         True, the superior court here never expressly considered *McGlothlin*'s elements before considering the content. But Rodriguez-Ramirez and the State jointly submitted the contents of the allegedly privileged recording for the superior court to review. The policies limiting in camera review, which are designed to protect privilege, bear little application when the privilege holder asks for the in camera review. *See Clements*, 249 Ariz. at 438 ¶ 1 ("[T]he court may not *invade* the privilege to determine its existence, even in camera . . . .") (emphasis added). There is no such invasion when the privilege holder voluntarily submits the information it claims is privileged to the superior court, asking the superior court to conduct an in camera review.

**¶19**         Also key to the analysis is which party seeks the in camera review. The privilege holder is the master of the privilege and can waive the privilege for a limited purpose to protect the privilege. *See Burch & Cracchiolo, P.A. v. Meyers*, 237 Ariz. 369, 376–77 ¶¶ 25–26 (App. 2015) (recognizing a privilege holder can waive privilege for limited purpose of allowing in camera review when necessary to assert privilege). Because Rodriguez-Ramirez sought the in camera review here, the 3-step *McGlothlin* analysis did not apply. Accordingly, the superior court did not have to

engage in that analysis before considering the content of the communication to determine whether the clergy-penitent privilege applied.

¶20        The limitation on considering the communication's content applies even though the privilege issue here is admissibility, not discoverability. *See* A.R.S. § 13-4062.3. In both situations, paragraph 3 prohibits testimony about clergy-penitent privileged communications "without consent of the person making the confession." *Id.* The court's analysis thus does not change just because the co-pastor made and distributed the recording to every family in the church and to another pastor without Rodriguez-Ramirez's knowledge or consent.

¶21        In summary, no matter how a court properly receives an allegedly privileged communication, the court considering the communication must limit its use. *McGlothlin*, 255 Ariz. at 457 ¶ 21 ("[E]ven when appropriate, [in camera review] should be limited."). *Archibeque* identified the generally applicable 3-step analysis to determine if the privilege applies based on the facts of that case: "(1) Is the person who received the confession a 'clergyman or priest'?; (2) Was the confession made while the clergyman or priest was acting in his professional capacity?; and (3) Was the confession made in the course of discipline enjoined by the church to which the clergyman or priest belongs?" 223 Ariz. at 234 ¶ 7 (paraphrasing A.R.S. § 13-4062.3). In articulating that 3-step process, *Archibeque* did not consider the communication's content. *Id.* We next articulate the appropriate process for determining if the privilege applies under the *Archibeque* analysis when the court is considering the content.

## II.    The clergy-penitent privilege applied to Rodriguez-Ramirez's confession.

¶22        The parties agree the communication here satisfies the first *Archibeque* element but dispute the second and third element. *See id.* Rodriguez-Ramirez argues the content of the communication shows it satisfies those elements.

¶23        The privilege belongs to the penitent. *Church of Jesus Christ of Latter-Day Saints*, 159 Ariz. at 28–29. "The party asserting a privilege has the burden of proving each of its elements." *Fann v. Kemp*, 253 Ariz. 537, 541 ¶ 8 (2022). Rodriguez-Ramirez thus bears that burden. *See id.*

¶24        To that point, an amicus argues the State bears the burden of proving the privilege does not apply once Rodriguez-Ramirez asserted it. We disagree. The amicus cites *State v. Bogan*, 183 Ariz. 506, 508 (App. 1995). That case involved the anti-marital fact privilege, *see* A.R.S. § 13-4062.1,

specifically whether the defendant's marriage to the testifying spouse was void because his prior marriage had not been legally dissolved. *Id.* That privilege is distinct because the law presumes the first marriage was legally dissolved. *See Wilson v. Wilson*, 1 Ariz. App. 77, 80–81 (1965). The party alleging the later marriage was invalid thus bears the burden of showing the invalidity of the later marriage. *See id.*; *see also Cross v. Cross*, 94 Ariz. 28, 31 (1963). *Bogan* thus does not stand for the broad proposition that the party opposing the privilege bears the burden of proving it does not apply.

### A.    Step 1: The co-pastor is a member of the "clergy."

¶25        Under *Archibeque*, the first question is, "Is the person who received the confession a 'clergyman or priest'?" 223 Ariz. at 234 ¶ 7. The State, in its response to defense counsel's petition, does not dispute step 1 was met: the co-pastor is "clergy" under the privilege statute. The co-pastor identified himself as a co-pastor and had held the position for 10 years. He graduated from a seminary with a certificate. He preached to the congregation when Rodriguez-Ramirez could not. He believed he could have taken charge of the church for 1 or 2 years if Rodriguez-Ramirez was absent. And he and Rodriguez-Ramirez acted as a "team" in the leadership of their church.

¶26        The co-pastor thus is a clergyman of a religious organization by the "organization's ecclesiastical rules, customs and laws." *Waters*, 209 Ariz. at 381 ¶ 2, 384 ¶ 18.

### B.    Step 2: The communication was a "confession" received in the co-pastor's professional character as clergy.

¶27        *Archibeque*'s second question is, "Was the confession made while the clergyman or priest was acting in his professional capacity?" 223 Ariz. at 234 ¶ 7. The unusual circumstances presented here requires us to expand upon *Archibeque*'s second question when a court consider the content of the communication to determine whether it was a "confession" made while the co-pastor was acting in his professional character. *Supra* ¶¶ 15–19.

#### 1.    The communication was a "confession."

¶28        Arizona courts have not directly articulated the meaning or scope of a "confession" under the statute when a court examines the communication itself. *See, e.g.*, *Church of Jesus Christ of Latter-Day Saints*, 159 Ariz. at 28 (declining to decide "validity of the [superior] court's distinction between confessional communications and interviews" when privilege was

waived); *Archibeque*, 223 Ariz. at 234–35 ¶¶ 6–14 (holding privilege applied to "alleged confession" of a meeting with clergy when scope of "confession" was not before the court).

¶29        Other jurisdictions have interpreted "confession" in similar privilege statutes. *See, e.g.*, *Scott v. Hammock*, 870 P.2d 947, 951 (Utah 1994). *But see id.* at 952 (citing contrary authorities). The Utah Supreme Court chose not to limit "confession" to "penitential communications" but construed it "in light of the particular doctrine or discipline of the church to which the [recipient of the confession] belongs." *Id.* at 950, 954. The Montana Supreme Court recognized "differing judicial perceptions" of various denominations might result in problematic application and thus adopted Utah's approach "in order to least interfere with the federal and [state] constitutional protections of religious freedom." *State v. MacKinnon*, 957 P.2d 23, 28 ¶ 24 (Mont. 1998); *see also State v. Glenn*, 62 P.3d 921, 925 (Wash. Ct. App. 2003). Because Arizona's statute aligns with these authorities, their reasoning is persuasive. *Compare* A.R.S. § 13-4062.3, *with Scott*, 870 P.2d at 950, and *MacKinnon*, 957 P.2d at 27 ¶ 20.

¶30        Under this standard, Rodriguez-Ramirez's conversation with the co-pastor constitutes a "confession." *See Scott*, 870 P.2d at 953. Rodriguez-Ramirez spoke with his co-pastor about his earlier actions, said he was struggling with unwanted urges, and acknowledged concern about what he did. He also expressed concern about the harm to the church, the congregation, the alleged victim, and the alleged victim's family. The co-pastor acknowledged those actions, discussed the harm it caused the alleged victim, and spoke about the spiritual ramifications for Rodriguez -Ramirez.

¶31        During the discussion, Rodriguez-Ramirez sought the co-pastor's help to minimize harm to the congregation. The communication also addressed matters of church management. They talked about whether it would be better for him to just leave without telling the congregation the truth. Alternatively, they considered whether it would be better to face the congregation. It reflected a concern for the congregation. For Rodriguez -Ramirez, a clergy member, church management concerns reflect how he could reach harmony with himself and the other members of his church. *See Waters*, 209 Ariz. at 384 ¶ 17. The conversation thus was a "confession" under A.R.S. § 13-4062.3.

### 2. Rodriguez-Ramirez held a reasonable subjective belief the co-pastor received the confession in his professional character.

¶32 The superior court concluded Rodriguez-Ramirez did not reasonably believe his conversation with the co-pastor was "confidential and for the purpose of spiritual guidance." Rodriguez-Ramirez argues the superior court should not have considered the reasonableness of his belief the co-pastor engaged in the allegedly privileged conversation in the co-pastor's professional character. Relying on *Waters*, Rodriguez-Ramirez argues the superior court may "only . . . assess the reasonableness of a penitent's belief . . . [when] there is a dispute" as to the clergy status of the receiver of a confession or "a denomination's rules, customs and laws . . . ." 209 Ariz. at 385 ¶ 25. But this proposed interpretation of *Waters* is too narrow.

¶33 In *Waters*, this court said a person's status as clergy under the privilege statute "should be determined by [the alleged clergy member's] organization's ecclesiastical rules, customs and laws." 209 Ariz. at 385 ¶ 21. In *dictum*, *Waters* also said a dispute about those rules, customs, and laws "*might*" require the superior court to assess the reasonableness of a communicant's belief of the alleged clergy member's status as clergy. *Id.* ¶ 25 (emphasis added). That *dictum* does not forbid the superior court from assessing the reasonableness of the claimant's belief in any of the elements triggering the statutory privilege. Indeed, *Waters* said as much. *See id.*

¶34 *Waters* justified, in part, not engaging in its own examination of the claimant's belief when it said, "[O]n the record presented, the [superior] court found [claimant's] belief unreasonable." *Id.* at 386. Such a finding of unreasonableness tracks the "subjective" test to determine whether an attorney-client relationship exists in the attorney-client privilege context. *See Clements*, 249 Ariz. at 440 ¶ 9. "The inquiry should examine a client's perception of the relationship and intent to secure legal advice." *Id.*

¶35 The examination, however, does not end with the privilege-claimant's asserted belief. The superior court "must *decide* whether the party consulting the attorney believes that he or she is approaching the attorney in a professional character and with the intent of securing legal advice." *Id.* (emphasis added) (quoting *State v. Fodor*, 179 Ariz. 442, 448 (App. 1994)). The court must examine "the nature of the work performed and . . . the circumstances under which the confidences were divulged" to decide whether the claimant really did perceive the privileged

relationship he claims. *Id.* (quoting *Alexander v. Superior Ct.*, 141 Ariz. 157, 162 (1984)).

¶36        When engaging in this subjective test of attorney-client relationships, Arizona courts and courts in other jurisdictions have noted the "reasonableness" of the putative client's belief in the relationship as a factor in their decisions. *See, e.g.*, *Alexander*, 141 Ariz. at 162 ("The record shows it would have been reasonable for [putative clients] to believe [putative attorney] was their attorney . . . ."); *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1321 (7th Cir. 1978) (ruling putative clients "entertained a reasonable belief" they had communicated with a law firm within a privileged relationship). Mere use of the term "reasonable" does not transmute a subjective test into an objective one when, as in the cited cases, it reflects the court's evaluation of the circumstances of the allegedly privileged communication and its effect on a unique claimant.

¶37        In short, *Waters* suggested 2 situations when examination of the reasonableness of a claimant's subjective belief about the recipient of a confession being clergy may be relevant: (1) when the court faces "a legitimate dispute regarding a denomination's rules, customs and laws" as to clergy membership or (2) when the recipient of the confession was a clergy imposter. 209 Ariz. at 385–86 ¶ 25 and n.9. But *Waters* did not prohibit courts from examining the claimant's subjective belief as to any element establishing a clergy-penitent communication as privileged.

¶38        The superior court thus did not abuse its discretion when it considered evidence of the reasonableness of Rodriguez-Ramirez's belief the co-pastor received the confession in his professional clerical character.

### 3.        Rodriguez-Ramirez held a reasonable subjective belief in the confidentiality of his confession.

¶39        The issue then is whether the superior court erred when it concluded Rodriguez-Ramirez did not reasonably believe the conversation was confidential and for spiritual guidance. Rodriguez-Ramirez argues he reasonably believed his statements to the co-pastor were privileged. The State argues that belief was unreasonable because Rodriguez-Ramirez and the co-pastor discussed how to talk about the allegations against Rodriguez-Ramirez with other people.

¶40        The superior court found Rodriguez-Ramirez's subjective belief about the privileged nature of the conversation with the co-pastor was unreasonable. The superior court relied on 2 key points: (1) the co-pastor discussed the allegations with the alleged victim's parents before

the confession and (2) Rodriguez-Ramirez was aware the co-pastor would discuss the allegations with the alleged victim's parents after the confession.

¶41    Rodriguez-Ramirez argues the superior court erred when it used those findings as a partial basis for concluding his "claimed belief" in the confidentiality of his confession and its purpose of spiritual guidance was unreasonable. He also challenges the superior court's reliance on those findings to support, in part, its determination the co-pastor did not receive the confession in his character as clergy. Rodriguez-Ramirez is correct.

¶42    The superior court could not draw an inference about whether the clergy-penitent privilege applies based on whether Rodriguez-Ramirez or the co-pastor treated the facts of the abuse allegations against Rodriguez-Ramirez as non-confidential.

¶43    The co-pastor offered Rodriguez-Ramirez spiritual advice and counsel. The co-pastor could provide that advice and counsel only in his character as co-pastor "so that harmony with [Rodriguez-Ramirez's] self and [the congregation could] be realized." *See Waters*, 209 Ariz. at 384 ¶ 17.

¶44    And the co-pastor only directed Rodriguez-Ramirez to speak with another pastor for a limited purpose. The co-pastor ultimately suggested Rodriguez-Ramirez speak to another pastor who also assisted at the church and who might provide more guidance about the best approach. At no point did the co-pastor decline to provide any guidance. He simply suggested other resources. And the co-pastor concluded the conversation by offering a prayer specific to Rodriguez-Ramirez.

¶45    That evidence establishes the co-pastor received Rodriguez-Ramirez's confession in his professional character as clergy. Even though the co-pastor testified he spoke with Rodriguez-Ramirez as a friend, he responded to Rodriguez-Ramirez's statements at least in part with clerical guidance and counsel.

¶46    Even so, the State argues the co-pastor is a longtime friend with Rodriguez-Ramirez and the co-pastor thought he was meeting with Rodriguez-Ramirez as a longtime friend, not a co-pastor. But the co-pastor's view of the conversation does not control whether the conversation is privileged. Rather, the issue is whether Rodriguez-Ramirez reasonably believed the conversation was privileged. *See Fodor*, 179 Ariz. at 448 ("The test for determining whether a communication is protected by the attorney-client privilege is a subjective one; it focuses primarily on the state of mind of the client."). Moreover, even if the co-pastor's belief were

relevant, the co-pastor acknowledged on cross-examination he was "providing both [] friendship and spiritual guidance" to Rodriguez -Ramirez.

¶47 Based on the above, the co-pastor received Rodriguez - Ramirez's confession in the co-pastor's professional character.

### 4. The co-pastor was acting within his professional character.

¶48 During the suppression hearing, the superior court also focused on whether the co-pastor acted in his professional character. To be in a clergy's professional character, "the communication [must] be directed to a clergyman in his or her capacity as a spiritual leader within his or her religious denomination." *Waters*, 209 Ariz. at 385 ¶ 22.

¶49 Other courts have construed "professional character" to mean the confessor intentionally sought out the clergy to provide spiritual counsel or advice. *See People v. Peterson*, 47 N.E.3d 1005, 1053 ¶ 198 (Ill. App. Ct. 2015) (communicating with clergy is privileged only if "made for the purpose of receiving spiritual counsel or consolation"); *Ex parte Zoghby*, 958 So. 2d 314, 322–23 (Ala. 2006).

¶50 But Arizona courts have never limited the professional character element to a clergy offering spiritual guidance for individual confessor's salvation. It is broader. Indeed, *Waters* explained the privilege "is a legislative response to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one's self and others can be realized." 209 Ariz. at 384 ¶ 17 (quotation omitted).

¶51 As above, the co-pastor responded to Rodriguez-Ramirez's statements by offering him spiritual guidance. *Supra* ¶¶ 43–45. Thus, the co-pastor received Rodriguez-Ramirez's confession in his professional character as clergy.

### C. Step 3: The co-pastor received the confessions "in the course of discipline enjoined by the church" to which he belonged.

¶52 "The 'in the course of discipline enjoined by the church' requirement refers to the duties and obligations of the clergyman and the rules and customs of the cleric's faith." *Waters*, 209 Ariz. at 297 ¶ 23. The clergy member must be "enjoined by the practices or rules of the clergy member's religion to receive the confidential communication and to

provide spiritual counsel." *Id.* (quoting *State v. Martin*, 959 P.2d 152, 157 (Wash. Ct. App. 1998)).

**¶53**        Rodriguez-Ramirez testified the discipline process of his and the co-pastor's church involved a face-to-face conversation with a pastor that may, "if the person doesn't understand," progress to a conversation with a witness present. The co-pastor also testified for wrongdoing within the church: "we" would first speak face-to-face with the person. Then, "if the person wasn't willing to listen," another person—preferably another "leader" in the church or someone "firm in [its] teachings"—would join the conversation. Finally, the co-pastor testified, the issue might be brought before a representative body of the church or even the whole church itself for a decision on how to handle the problem. He testified the process typically would terminate at the first or second step, involving 1 witness at most. Rodriguez-Ramirez agreed with the co-pastor's testimony about this process.

**¶54**        Rodriguez-Ramirez and the co-pastor testified consistently about their church's disciplinary process, and their conversation at the park conformed to that process. Rodriguez-Ramirez met alone with the co-pastor. They met at a park, but as the superior court noted, they met at the height of the pandemic restrictions. Rodriguez-Ramirez made statements about the allegations against him, and the co-pastor dispensed priestly advice and counsel.

**¶55**        Because Rodriguez-Ramirez made his confessions to the co-pastor in a confessional conversation in conformity with their testimony about the church's rules and customs, the co-pastor received them "in the course of discipline enjoined by the church" to which he belonged.

**III.     The clergy-penitent privilege applies to the recording and the transcript of the recording as well as the co-pastor's testimony about the confession.**

**¶56**        Section 13-4062 introduces all statutory privileges in Title 13's criminal code. It reads, "A person shall not be examined as a witness in the following cases . . . ." Though the statute refers to being "examined as a witness," Rodriguez-Ramirez argues the clergy-penitent privilege also precludes the admission of the recording and transcript. We address this issue because it likely will arise on remand. *See State v. Abdi*, 226 Ariz. 361, 366 ¶ 18 (App. 2011).

**¶57**        Despite the statutory language appearing to limit the privilege to "being examined as a witness," Arizona courts consistently

apply the language more broadly. For example, this same language applies to Arizona's statutory attorney-client privilege, and the courts have applied that privilege beyond attorney testimony, applying it to text messages, documents in a file, and recordings of phone calls. *See, e.g.*, *Adleman*, 252 Ariz. at 363 ¶ 22 (considering whether privilege applied to text messages); *Clements*, 249 Ariz. at 441 ¶ 18 (addressing recordings of phone calls); *Lund v. Myers*, 232 Ariz. 310, 310 ¶ 4, 311–12 ¶ 13 (2013) (addressing documents from attorney's client file).

¶**58** True, courts more narrowly construe the clergy-penitent and physician-patient privileges because they lack the common-law tradition of the attorney-client privilege. *See Waters*, 209 Ariz. at 384 ¶ 16 (noting the narrow construction for the clergy-penitent privilege); *State v. Wilson*, 200 Ariz. 390, 393 ¶ 5 (App. 2001) (noting the narrow construction for the physician-patient privilege). Even so, Arizona applies the physician-patient privilege to protect medical records beyond physician testimony. *See State v. Zeitner*, 244 Ariz. 217, 221 ¶ 16 (App. 2018). In an earlier case, the court explained it does so to avoid "render[ing] the statutory privilege meaningless or of no effect." *Tucson Med. Ctr. Inc. v. Rowles*, 21 Ariz. App. 424, 427 (1974). And it would be strange, indeed, if the courts were to apply precisely the same statutory language addressing privileges differently based on which privilege was at issue. *See Qasimyar v. Maricopa Cnty.*, 250 Ariz. 580, 587 ¶ 19 (App. 2021) (citing *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 88 ¶ 17 (2019) and Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 172–73 (2012)). As the court in *Qasimyar* said, "a word or phrase used in related statutes should be construed to bear the same meaning throughout." 250 Ariz. at 587 ¶ 19. That approach tracks sound paradigms of statutory construction. "Any word or phrase that comes before a court for interpretation is . . . part of an entire *corpus juris*. . . . Hence laws dealing with the same subject . . . should if possible be interpreted harmoniously." Scalia & Garner, *supra*, at 252. We agree. "The presumption of consistent usage applies also when different sections of an act or code are at issue. . . . [T]he more the connection the cited statute has with the statute under consideration, the more plausible the argument becomes." *Id.* at 172–73.

¶**59** Applying that same reasoning to the clergy-penitent privilege, the clergy-penitent privilege extends to the recording and the transcript. *See Rowles*, 21 Ariz. App. at 427.

## CONCLUSION

**¶60** We accept jurisdiction and grant relief. We vacate the superior court's denial of Rodriguez-Ramirez's suppression motion and remand for proceedings consistent with this opinion.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:        JR